# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

FIREBIRD STRUCTURES, LCC,

       Plaintiff,

vs.                                          No. CIV 17-0397 JB/JLF

UNITED BROTHERHOOD OF
CARPENTERS AND JOINERS OF
AMERICA, LOCAL UNION NO. 1505,

       Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Plaintiff's Application for Temporary Restraining Order and Preliminary Injunction, filed April 4, 2017 (Doc. 3)("Motion"). The Court held a hearing on April 10, 2017. The primary issues are: (i) whether the Court has jurisdiction over this case given that Plaintiff Firebird Structures filed an amended complaint in federal court asserting a federal claim, see First Amended Verified Complaint for Damages and Injunctive Relief ¶¶ 17-26, 3-4, filed April 10, 2017 (Doc. 14)("Verified Complaint"), after the Defendant Carpenters' Union removed, on complete preemption grounds, Firebird Structures' original complaint asserting state-law claims only, see Verified Complaint for Damages and Injunctive Relief, filed in state court on March 30, 2017, filed in federal court on March 31, 2017 (Doc. 1-1)("Original Complaint"); (ii) whether the Norris-LaGuardia Act, 29 U.S.C. §§ 101-115, applies to Firebird Structures' Motion; and (iii) whether the Court should grant Firebird Structures a temporary restraining order ("TRO") and thereby enjoin the Carpenters' Union from conducting activity that Firebird Structures contends is unlawful. The Court concludes: (i) that it has jurisdiction pursuant to 28 U.S.C. §§ 1331 & 1367(a), because the Verified Complaint asserts a federal claim and Firebird Structures' federal claim and state-law tort claims arise out of

the same set of factual assertions regarding the Carpenters' Union's alleged campaign against Firebird Structures; (ii) that the Norris-LaGuardia Act applies, because Firebird Structures and the Carpenters' Union are involved in a "labor dispute" as the Norris-LaGuardia Act defines that term, 29 U.S.C. §§ 101 & 113(a)-(c); (iii) that Firebird Structures is not entitled to injunctive relief on its claim arising under § 303 of the Labor-Management Relations Act ("LMRA"), 29 U.S.C. § 187, because that statutory provision awards only damages; (iv) that Firebird Structures is not likely to prevail on its two claims asserting tortious interference with contractual relations, because Firebird Structures' LMRA § 303 claim, 29 U.S.C. § 187, preempts those claims; (v) that Firebird Structures is not likely to prevail on its claims for trespass, nuisance, harassment, and prima facie tort, because Firebird Structures has not satisfied its burden, set forth by the Norris-LaGuardia Act's § 6, 29 U.S.C. § 106, to establish by "clear proof" that the Carpenters' Union authorized or was otherwise involved in the alleged tortious conduct; (vi) that the Norris-LaGuardia Act's § 4, 29 U.S.C. § 104, deprives the Court of jurisdiction to enjoin the Carpenters' Union from certain conduct that Firebird Structures asserts is tortious, including peacefully assembling, peacefully communicating with Firebird Structures' employees and prospective employees, and peacefully and non-fraudulently giving publicity to the labor dispute between Firebird Structures and the Carpenters' Union; and (vii) that the four factors guiding the propriety of PI relief weigh against the Court's issuance of a TRO to Firebird Structures. Accordingly, the Court denies Firebird Structures' Motion.

## FINDINGS OF FACT

"A temporary restraining order requires the Court to make predictions about the plaintiff's likelihood of success." Herrera v. Santa Fe Pub. Sch., 792 F. Supp. 2d 1174, 1179 (D.N.M. 2011)(Browning, J.)("'[T]he findings of fact and conclusions of law made by a court

granting a preliminary injunction are not binding at trial on the merits.'")(alteration in original)(quoting Attorney Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d 769, 776 (10th Cir. 2009)). "The Federal Rules of Evidence do not apply to preliminary injunction hearings." Heideman v. S. Salt Lake City, 348 F.3d 1182, 1188 (10th Cir. 2003). Furthermore, as applicable in this case, the Norris-La Guardia Act § 9, 29 U.S.C. § 109, provides:

> No restraining order or temporary or permanent injunction shall be granted in a case involving or growing out of a labor dispute, except on the basis of findings of fact made and filed by the court in the record of the case prior to the issuance of such restraining order or injunction; and every restraining order or injunction granted in a case involving or growing out of a labor dispute shall include only a prohibition of such specific act or acts as may be expressly complained of in the bill of complaint or petition filed in such case and as shall be expressly included in said findings of fact made and filed by the court as provided in this chapter.

29 U.S.C. § 109. Accordingly, the Court finds as follows:

1.      Firebird Structures is a New Mexico limited liability company doing business in Bernalillo County, New Mexico. See Verified Complaint ¶ 1, at 1.[1]

2.      Firebird Structures is "a metal framing, drywall, stucco contractor," has eighty-seven employees, fifty-four of whom are carpenters, and has been in business for over six years. Draft Transcript of Motion Proceedings at 19:17-20:14, taken April 10, 2017 (Cannedy)("Tr.").[2]

---

[1]In making its findings of fact, the Court may rely on allegations in a verified complaint. The Court

> may issue a temporary restraining order without written or oral notice to the adverse party or its attorney only if . . . specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard . . . .

Fed. R. Civ. P. 65(b)(1)(A)(alterations added). Cf. Lantec, Inc. v. Novell, Inc., 306 F.3d 1003, 1019 (10th Cir. 2002)("A district court may treat a verified complaint 'as an affidavit for purposes of summary judgment if it satisfies the standards for affidavits set out in Rule 56(e).'")(quoting Conaway v. Smith, 853 F.2d 789, 792 (10th Cir. 1988)).

[2]The Court's citations to the transcript of the hearing refer to the court reporter's

3.      Trent Cannedy is Firebird Structures' President.  <u>See</u> Tr. at 19:12 (Cannedy).

4.      Keven Conboy is a Firebird Structures' partner.  <u>See</u> Tr. at 107:22-23 (Conboy).[3]

5.      The Carpenters' Union is a labor organization operating in Bernalillo County, New Mexico, with its principal place of business at 3900 Pan American Fwy. NE, Albuquerque, New Mexico 87107.  <u>See</u> Verified Complaint ¶ 2, at 1.

6.      Firebird Structures does not recognize the Carpenters' Union as its employees' representative.  <u>See</u> Verified Complaint ¶ 5, at 1.

7.      No federal or state agency has required Firebird Structures to recognize the Carpenters' Union as a representative of Firebird Structures' employees for any purpose.  <u>See</u> Verified Complaint ¶ 6, at 2.

8.      The Carpenters' Union is engaging in an organizing campaign against Firebird Structures.  <u>See</u> Declaration of John Whitesitt ¶ 1, at 1, filed April 7, 2014 (Doc. 10-1)("Whitesitt Decl.").  <u>See also</u> Verified Complaint ¶ 14, at 3 (alleging that the Carpenters' Union sent letters to Firebird Structures' current and prospective business partners to encourage and coerce those entities to cease current and prospective contracts with Firebird Structures).

9.      Firebird Structures does not pay its carpenters union-scale wages.  <u>See</u> Tr. at 53:5 (Cannedy).

10.      Juan Gonzales worked at Firebird Structures as a superintendent.  <u>See</u> Tr. at 121:13-19 (Gonzales).

11.      Gonzales has been a Carpenters' Union member since 2008.  <u>See</u> Tr. at 130:20

---

original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

[3]Although Conboy testified that he is a Firebird Structures' partner, <u>see</u> Tr. at 107:22-23, Firebird Structures is an LLC; accordingly, Conboy is most likely a Firebird Structures' member or manager.  <u>See</u> NMSA 1978, § 53-19-2(L)-(M).

(Gonzales).

12.     On February 9, 2017, Cannedy planned to have lunch with Gonzales to discuss how "to move the company forward," but when Cannedy saw that "the local union guy [Randy Thornhill from the Carpenters' Union] was there," Cannedy "walked out of the restaurant." Tr. at 22:7-13 (Cannedy). Tr. at 121:23-122:14 (Gonzales).

13.     Gonzales pursued Cannedy, and inquired about his sudden departure from the lunch meeting. See Tr. at 122:22-23 (Gonzales). Cannedy responded that "the union was just going to take money from his [Cannedy's] pocket." See Tr. at 123:3-4 (Gonzales).

14.     Firebird Structures subsequently discharged Gonzales, within two or three days after the proposed February 9, 2017, meeting. See Tr. at 43:17 (Cannedy); id. at 44:5 (Cannedy); id. at 124:1 (Gonzales).

15.     The parties dispute why Firebird Structures discharged Gonzales. Firebird Structures states that it "let go of Juan Gonzalez because of poor safety." Tr. at 43:17-18 (Cannedy). Gonzalez states that, after his inquiry about the reason for his termination, Robert Petzel, the Firebird Structures' employee who discharged Gonzales, did not say that Gonzales was being discharged for safety concerns, but only stated that "it's something that [Gonzales] had to talk to Trent [Cannedy] about." Tr. at 124:11-13 (Gonzales).

16.     After Firebird Structures discharged him, Gonzales organized a meeting of Firebird Structure employees at the Carpenters' Union. See Tr. at 134:10-14 (Gonzales).

17.     On or about Friday, February 10, 2017, approximately twenty-eight of Firebird Structures' employees went on strike to support the Carpenters' Union campaign against Firebird Structures. See Whitesitt Decl. ¶ 7, at 2; United States of America National Labor Relations Board Charge Against Employer at 2, filed April 7, 2014 (Doc. 10-4)("NLRB Charge Against

Employer").

18.    On that day, those employees went to the Carpenters' Union.  See Tr. at 42:9-10 (Cannedy).

19.    On that day, Robert Petzel, the Firebird Structures' manager who discharged Gonzales, "pulled up on the frontage road of the union hall," ostensibly to observe the carpenters who "were all getting ready to walk into the union hall."  Tr. at 127:18-22 (Gonzales).

20.    On Friday, February 10, 2017, or the following Monday, February 13, 2017, Firebird Structures no longer employed the employees who attended the meeting at the Carpenters' Union.  See Whitesitt Decl. ¶ 7, at 2; Tr. at 24:2-3 (Cannedy).[4]

21.    The Carpenters' Union paid the former Firebird Structures' employees.  See Whitesitt Decl. ¶ 7, at 2.[5]

22.    The Carpenters' Union has distributed fliers concerning their labor dispute with Firebird Structures, and these fliers represent that Firebird Structures fails to pay proper wages and that Firebird Structures unlawfully discharged its employees.  See Whitesitt Decl. ¶ 6, at 1.

---

[4]The Carpenters' Union maintains that, "[i]n response to [these employees'] concerted and protected actions, Firebird conducted an unlawful mass firing."  Whitesitt Decl. ¶ 7, at 2. The Southwest Regional Council of Carpenters filed the NLRB Charge Against Employer, alleging that Firebird Structures discharged twenty-eight employees on or about February 10, 2017, "because they supported and assisted the Union and engaged in protected concerted activities . . . ."  NLRB Charge Against Employer at 2.  Firebird Structures maintains that these employees quit their jobs.  See Tr. at 24:2-3 (Cannedy).  The Carpenters' Union is a local union of the Southwest Regional Council of Carpenters.  See Southwest Carpenters "Local Unions," https://www.swcarpenters.org/local-unions.

[5]The parties dispute why the Carpenters' Union paid the former Firebird Structures' employees.  Compare Verified Complaint ¶ 11, at 2 (alleging that the Carpenters' Union offered Firebird Structures' employees up to $3,500.00 to quit employment at Firebird Structures), with Whitesitt Decl. ¶ 7, at 2 ("The money paid is in mitigation of the damages the workers are pursuing with the National Labor Relations Board, and is paid while the workers have attended training classes at the union hall.").

See also "What Does Firebird Not Want Workers to Know," filed April 7, 2014 (Doc. 10-4)("Flyer 1"); "Shame on Faith Baptist Church," filed April 7, 2014 (Doc. 10-4)("Flyer 2"); "Shame on Presbyterian Hospital," filed April 7, 2014 (Doc. 10-4)("Flyer 3");[6] Verified Complaint ¶ 10, at 2 (alleging that the Carpenters' Union circulated flyers containing information regarding relations between Firebird Structures' management and employees).

23.     The Carpenters' Union has also displayed banners in front of Firebird Structures' clients. See Tr. at 57:8 (Cannedy); id. at 58:1 (Cannedy).

24.     The Carpenters' Union employed fliers and banners regarding Firebird Structures' economic relationship with Presbyterian Hospital, and those materials refer to Dr. Rosenschein who was allegedly arrested in connection with charges related to child pornography. See Tr. at 33:19-34:7 (Cannedy); Flyer 3 at 1. The allegations of sex crimes are unrelated to the labor dispute between Firebird Structures and the Carpenters' Union. See Tr. at 63:8 (Cannedy).

25.     The Carpenters' Union displayed a banner which displayed both "Labor Dispute" and "Community Alert Sex Crimes Against Children Alleged at Presbyterian." Firebird Structures' TRO Hearing Ex. 2.

26.     The Carpenters' Union has also distributed hardhat stickers stating "Anything But Firebird." Tr. at 35:12-13 (Cannedy). See Tr. at 58:5-6 (Cannedy).

27.     After Firebird Structures' employees quit, Carpenters' Union representatives attended Firebird Structures' job sites and "parked across the street from" Firebird Structures' main office to observe and to communicate with persons seeking employment with Firebird Structures; after speaking with Carpenters' Union representatives, these persons "would never

---

[6]Firebird Structures states that these fliers are false. See Tr. at 30:16-17 (Cannedy); Tr. at 31:16-24 (Cannedy) . The Carpenters' Union denies that the fliers are false. See Whitesitt Decl. ¶ 6, at 1.

show back up" at Firebird Structures. Tr. at 24:16-23 (Cannedy). <u>See</u> Tr. at 88:2-4 (Romero)("They would just sit there taking pictures or video of people walking in and out of our building."); <u>id.</u> at 89:25-90:1 (Romero)("[U]nion reps have gone to the job sites, to multiple job sites, offering cash for our employees to leave . . . ."); <u>id.</u> at 104:11-13 (Romero)(stating that union representatives are "continuing to show up at job sites and asking employees to join the union, offering the money after being told 'No'"); <u>id.</u> at 105:6-16 (Romero)("I've watched them surveil our company and sit there and take pictures of people, and stop them as they walk out of our building . . . to get [employees] to join the union.").

28. On one occasion, when former Firebird Structures' employees went to Firebird Structures' office to retrieve their final paychecks, Carpenters' Union representatives also presented themselves at the Firebird Structures' office. <u>See</u> Tr. at 92:24-93:6 (Cannedy). Because Firebird Structures' office is located on a cul-de-sac, the Carpenters' Union representatives blocked access to the Firebird Structures' facility. <u>See</u> Tr. at 93:9-12 (Cannedy). Firebird Structures called the police; the police instructed the Carpenters' Union representatives that they were not allowed to block the road; the union complied; and the police did not make any arrest. <u>See</u> Tr. at 102:6-21 (Cannedy).

29. At some point in February 2017, union representatives entered Firebird Structures' main office, seeking to speak with Cannedy. <u>See</u> Tr. at 27:18-23 (Cannedy). <u>See also</u> Verified Complaint ¶ 13, at 2-3 (alleging that the Carpenters' Union entered Firebird Structures' property without permission at their principal place of business and job sites).

30. After the union representatives left that day, screws were found behind the tires of Firebird Structures' vehicles and the vehicles of Firebird Structures' employees at a "separate parking area where the employees parked to go to the job site." Tr. at 61:24-25 (Cannedy). <u>See</u>

Tr. at 92:14-20 (Romero).

31.     On February 22, 2017, a vehicle belonging to a Firebird Structures' employee, which was parked near the main office while the employee was out of town, had its back windshield "bashed in." Tr. at 27:25-28:3 (Cannedy). <u>See</u> <u>id.</u> at 69:9 (Erb). Numerous sheet metal screws were also discovered underneath that vehicle. <u>See</u> Tr. at 69:8-11 (Erb). <u>See also</u> Verified Complaint ¶ 9, at 2.

32.     Screws were also discovered behind Firebird Structure vehicles' tires at the Presbyterian Hospital job site on Central Avenue. <u>See</u> Tr. at 28:22-23 (Cannedy); <u>id.</u> at 50:11-12 (Cannedy). <u>See also</u> Verified Complaint ¶ 9, at 2 (alleging vandalism and damage to the property at sites where Firebird Structures conducts business).

33.     In every case, Firebird Structures does not know who placed the screws behind the vehicles' tires. <u>See</u> Tr. at 51:9 (Cannedy).

34.     On or about February 15, 2017, at midnight, Cannedy saw a truck, which resembled the truck that had parked across from the Firebird Structures' main office, parked outside of his house; the truck contained four persons who appeared, at least to Cannedy at the midnight hour, to be taking photographs. <u>See</u> Tr. at 25:17-21 (Cannedy); <u>id.</u> at 46:14-16 (Cannedy).

35.     Further, a few days after Firebird Structures no longer employed the twenty-eight employees, Conboy discovered a "a four- or five-pound dead catfish wrapped in bloody newspapers on [his] driveway in front of [his] gate." Tr. at 108:15-17 (Conboy)(alterations added). He reported this incident to the police. <u>See</u> Tr. at 69:20-22 (Erb); <u>id.</u> at 78:20 (Erb).

36.     A vehicle, which had parked across from Firebird Structures, followed Conboy's vehicle after Conboy departed from his office at Firebird Structures, at least once or twice, and at

least until Conboy arrived at "a busy intersection." Tr. at 109:1-3 (Conboy). See id. at 116:22-117:2 (Conboy).

37.     One or two vehicles that were parked across from Firebird Structures' main office drove past Conboy's residence. See Tr. at 114:18-115:5 (Conboy). See also Verified Complaint ¶ 12, at 2 (alleging that the Carpenters' Union surveilled and stalked Firebird Structures' owners at their principal place of business, job sites, and homes).

38.     The Carpenters' Union placed a sign on a street near Conboy's residence, stating that "Firebird Bad For America & Bad for New Mexico. New Mexico Beware!" Firebird Structures' TRO Hearing Ex. 6. See Tr. at 110 2-12 (Conboy, Thomas);

39.     Firebird Structures contacted the police to complain of the conduct and alleged harassment by Carpenters' Union representatives or members. See Tr. at 106:8-9 (Romero); id. at 68:8 (Erb). Law enforcement did not make any arrest. See Tr. at 71:2-5 (Erb)("Keep in mind that I did not have probable cause to make any arrests . . . [regarding] . . . harassment . . . [or] the criminal damage to property."). Law enforcement, however, suspected the Carpenters' Union, and advised the Carpenters' Union "to cease any and all criminal activity." Tr. at 71:10-11 (Erb).

40.     Firebird Structures' employees have expressed fear regarding the labor dispute, and Firebird Structures has had "to reassure them every day that they'll be fine." Tr. at 36:23-24 (Cannedy).

## PROCEDURAL HISTORY

41.     On March 30, 2017, in state court, Firebird Structures filed its Original Complaint. In the Original Complaint, Firebird Structures alleged claims for: (i) tortious interference with existing contractual damages, see Original Complaint ¶¶ 15-20, at 3;

(ii) intentional interference with prospective contractual relations, see Original Complaint ¶¶ 21-27, at 3-4; (iii) prima facie tort, see Original Complaint ¶¶ 28-33, at 4; and (iv) injunctive relief, see Original Complaint ¶¶ 34-40, at 4-5.[7]

42.     The following day, the Carpenters' Union petitioned for removal to federal court, asserting that the Court has federal question jurisdiction under 28 U.S.C. § 1441(b), because § 303 of the Labor Management Relations Act, 29 U.S.C. § 187, preempts Firebird Structures' state-law tort claims.  See Petition for Removal at 2, filed March 31, 2017 (Doc. 1)("Removal Petition").

43.     Also, on March 31, 2017, the Southwest Regional Council of Carpenters, of which the Carpenters' Union is a local affiliate, filed with the National Labor Relations Board ("NLRB") a Charge Against Employer against Firebird Structures, alleging that Firebird Structures "interfered with, restrained and coerced its employees in the exercise of the rights guaranteed by the [National Labor Relations Act]."  NLRB Charge Against Employer at 1.

44.     On April 10, 2017, Firebird Structures filed the Verified Complaint, which amended the Original Complaint.  See Verified Complaint ¶¶ 17-67, at 3-7.  In its Verified Complaint, Firebird Structures asserted claims for: (i) violation of 29 U.S.C. § 187, see Verified Complaint ¶¶ 17-26, at 3-4; (ii) trespass, see Verified Complaint ¶¶ 27-31, at 4; (iii) nuisance, see Verified Complaint ¶¶ 32-36, at 4-5; (iv) harassment, see Verified Complaint ¶¶ 37-41, at 5; (v) tortious interference with existing contractual relations, see Verified Complaint ¶¶ 42-46, at 5-6; (vi) intentional interference with prospective contractual relations, see Verified Complaint ¶¶ 48-54, at 6; (vii) prima facie tort, see Verified Complaint ¶¶ 55-60, at 6-7; and (viii) injunctive

_____

[7]Firebird Structures also sought a TRO in state court, which the state court denied.  See Notice of TRO Denial, filed in state court April 3, 2017, filed in federal court April 7, 2017 (Doc. 10-2)("The TRO is Denied.  You may submit a request for an injunction hearing.").

relief, see Verified Complaint ¶¶ 61-67.

**1.      Firebird Structures' Motion.**

44.      On April 4, 2017, Firebird Structures filed an application for a temporary restraining order and preliminary injunction.  See Motion at 1.  First, in its Motion, Firebird Structures applies for a temporary restraining order and preliminary injunction, proscribing the Carpenters' Union from: (i) "threatening, intimidating, coercing, following, or harassing" Firebird Structures' owners and employees; (ii) damaging Firebird Structures' property and that of its owners and employees; and (iii) interfering with Firebird Structures' existing and future contractual relations.  Motion at 1.  See Motion at 4-5.  Firebird Structures submits its Motion "pursuant to Rule 1-066 NMRA."  Motion at 1.[8]

45.      Firebird Structures next addresses the Court's jurisdiction, asserting that the Court "has jurisdiction pursuant to both 20 [sic] U.S.C. § 1331 and 28 U.S.C. § 1367."  Motion at 1. Firebird Structures argues that § 303 of the Labor Management Relations Act, 29 U.S.C. § 187, does not preempt its state-law tort claims.  See Motion at 1-2 (citing Bldg. & Constr. Trades Council, 507 U.S. 218, 225 (1993); Retail Prop. Trust v. United Bhd. of Carpenters & Joiners of Am., 768 F.3d 938, 958-59 (9th Cir. 2014)("Retail Prop. Trust").  Firebird Structures contends that Congress did not intend the Carpenters' Union's "intentional tortious acts to be protected activity under the NLRA," and Firebird Structures emphasizes that "granting an injunction in this instance does not affect the rights of Defendants, or more importantly, the rights of Firebird's

---

[8]When exercising either diversity or supplemental jurisdiction over state-law claims, the federal courts apply the Federal Rules of Civil Procedure.  See Hanna v. Plumer, 380 U.S. 460, 465 (1965)(citing Guaranty Trust Co. of N.Y. v. York, 326 U.S. 99 (1949); Erie R.R. Co. v. Tompkins, 304 U.S. 64 (1938)); 17A J. Moore, Moore's Federal Practice § 124.01[4], at 124-12 (3d ed. 2004)("The Erie doctrine has been developed in the context of federal diversity litigation. However, Erie principles also apply to pendant state claims litigated in federal courts.").  Accordingly, the Court will construe Firebird Structures' Motion as made pursuant to rule 65 of the Federal Rules of Civil Procedure.

employees, under the [NLRA.]"  Motion at 3.

46.    Firebird Structures requests that the Court enjoin the Carpenters' Union

from committing further intentional torts, whether they are violating state or
federal law, against Firebird, its owners and employees, and those with whom
Firebird does business; any property belonging to Firebird, its owners and
employees, and those with whom Firebird does business; and from committing
further intentional economic torts aimed at shutting down Firebird's business.

Motion at 3-4.  Firebird Structures avers that it has asked the Carpenters' Union to "cease its

tortious activities," and asserts that the Carpenters' Union's conduct "will continue unless

restrained by this Court."  Motion at 5.  Finally, Firebird Structures alleges that it will suffer

immediate and irreparable economic injury if the Court does not issue a TRO in its favor.  See

Motion at 5.

**2.    The Carpenters' Union's Response.**

47.    On April 7, 2017, the Carpenters' Union filed an Opposition to Application for

Temporary Restraining Order and Preliminary Injunction, filed April 7, 2017

(Doc. 10)("Response").  The Carpenters' Union argues that this case stems out of a labor dispute,

and, therefore, the Court's power to issue an injunction against the union defendants must

comply with the requirements of Norris-LaGuardia Act, 29 U.S.C. §§ 101-115, in addition to

satisfying the traditional four-part test for a preliminary injunction.  See Response at 2, 4-5.

48.    The Carpenters' Union contends that Firebird Structures cannot meet the

requirements for injunctive relief under the Norris-LaGuardia Act, for three reasons.  First, the

Carpenters' Union argues that Firebird Structures "fails to tie the allegedly wrongful conduct to

the Defendant labor union with the requisite 'clear proof' standard" and instead relies on bare

allegations that the Carpenters' Union is responsible for the alleged conduct.  Response at 2

(quoting 29 U.S.C. § 106).  See Response at 8-9 (citing 29 U.S.C. § 106; United Mine Workers

of Am. v. Gibbs, 383 U.S. 715, 736 (1966)("Gibbs"); Fry v. Airline Pilots Assoc., 88 F.3d 831,

842 (10th Cir. 1996)("Fry")).  The Carpenters' Union asserts that "there is no evidence, let alone

'clear proof' that any of the alleged wrongful acts . . . were authorized or ratified by the

Defendant labor union, or that the alleged acts were committed by the Defendant, as opposed to

individuals not acting per any instruction from the Defendant union."  Response at 9.  The

Carpenters' Union contends that Firebird Structures "merely alleges" that the union "engaged in

certain conduct, with no facts tying the unidentified individuals allegedly engaging in the

unlawful conduct to the Defendant labor union."  Response at 9-10.  The Carpenters' Union

reasons that, under 29 U.S.C. §§ 101 & 106, Firebird Structures' allegations are insufficient for

the Court to issue an injunction against the union.  See Response at 10 (citing Fry, 88 F.3d at

842; Richie v. United Mine Workers, 410 F.2d 827, 834-35 (6th Cir. 1969)).[9]

     49.    Second, the Carpenters' Union argues that the Court cannot grant Firebird

Structures injunctive relief, because Firebird Structures comes to the Court with "unclean

hands."  Response at 3 (citing 29 U.S.C. § 108).  The Carpenters' Union asserts that, under § 8 of

the Norris-LaGuardia Act, 29 U.S.C. § 108, Firebird Structures' "unfair labor practices

disqualify it from obtaining injunctive relief."  Response at 10.  In support of this argument, the

Carpenters' Union alleges that Firebird Structures committed "hallmark" NLRA violations

through "threats and mass firings in response to its employees going to the union's hall to discuss

the union, and also paying workers to not support the union."  Response at 10 (citing NLRB v.

Wilhow Corp., 666 F.2d 1294, 1305 (10th Cir. 1981); NLRB v. Jamaica Towing, Inc., 632 F.2d

---

[9]The Carpenters' Union further asserts that Firebird Structures' allegations do not even satisfy the requirements for pleading under rule 12(b)(6) of the Federal Rules of Civil Procedure. See Response at 7 (citing Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 557 (2007)).

208, 212-13 & n.3 (2d Cir. 1980)).

50.     Third, the Carpenters' Union presses that "some of the conduct that Plaintiff seeks to prohibit is lawful concerted conduct protected by Section 7 of the NLRA and immune from injunctive relief under Section 4 of the NLA." Response at 3 (citing 29 U.S.C. § 104(a), (c)-(f)). See Response at 11-13. The Carpenters' Union states that "the non-violent picketing, following workers to jobsites, labor speech, handing out handbills and sending letters is protected," and consequently cannot ground state-law tort claims. Response at 3 (citations omitted). The Carpenters' Union denies picketing, stalking, or harassing Firebird Structures; however, the Carpenters' Union maintains that, even had it conducted the alleged activity, "picketing and following workers to jobsites to talk about the union or to picket is protected conduct." Response at 11 (citing Steelworkers (Carrier Corp.) v. NLRB, 376 U.S. 492, 499 (1964)). The Carpenters' Union asserts that it has the right "to follow the primary employer's trucks and employees to the jobsite." Response at 12 (citing Local No. 12, Int'l Union of Operating Eng'rs (Cal Tram Rebuilders), 267 N.L.R.B. 272, 274 (1983)).

51.     The Carpenters' Union also asserts that its fliers constitute labor speech, which the First Amendment of the Constitution of the United States of America protects, see Response at 12 (citations omitted), and further argue that distributing handbills is also protected conduct under the NLRA, see Response at 12-13 (citations omitted). The Carpenters' Union concludes that the Court may not issue a TRO, because: (i) Firebird Structures fails to comply with the evidentiary requirements that the Norris-LaGuardia Act imposes; (ii) the Court may not enjoin protected conduct; and (iii) Firebird Structures fails to satisfy the four-part equitable test regarding the issuances of preliminary injunctive relief. See Response at 13.

**3.      The Hearing.**

52.      On April 10, 2017, the Court held a hearing.  See Tr. at 1:13 (Court).   The Court confirmed that, in light of Firebird Structures' amended Verified Complaint, which includes a claim for violation of 29 U.S.C. § 187, there is no dispute regarding the Court's jurisdiction.  See Tr. at 6:21-7:12 (Court, Thomas); Tr. at 7:24-25 (Thomas).

53.      Firebird Structures restated its request for an injunction:

> We are asking for an injunction that says . . . the union cannot damage our property, cannot harass, intimidate, threaten employees or owners or family members of the company; cannot stalk outside their house . . . [a]nd really cannot be putting out salacious, completely false, misleading statements, implying that there are sex offenders working for [Firebird Structures].

Tr. at 139:4-12 (Thomas).

54.      Firebird Structures also repeated its argument that the Court may issue a TRO on the state-law tort claims.  See Tr. at 140:25-143:11 (Thomas)(discussing Retail Prop. Trust, 768 F.3d 938).  Firebird Structures argued that the Court should not review its claims under any federal act, but rather under New Mexico law and "the standard for issuing an injunction that the Court is well aware of."   Tr. at 143:15-16 (Thomas).   Firebird Structures emphasized that "[t]here is damage to property" and "consistent harassment" of Firebird Structures' employees and principals.  Tr. at 143:22-144:1 (Thomas).  Firebird Structures alleged that this conduct would not stop unless the Court issues injunctive relief.  See Tr. at 144:5-6 (Thomas).

55.      The Carpenters' Union responded that "[t]his case is why the Norris-LaGuardia Act was passed."  Tr. at 144:16-17 (Shanley).  The Carpenters' Union stressed that Firebird Structures adduced "no direct evidence or any indirect evidence that the union did anything."  Tr. at 144:19-20 (Shanley).  The Carpenters' Union then addressed "all the conduct upon which the Court cannot give injunctive relief," under the Norris-LaGuardia Act, "but which the Plaintiff

seeks." Tr. at 145:22-24 (Shanley).

> You can't give injunctive relief to having people go on strike, Subsection A. We can't have people not be paid by the union; that's Subsection C. We can't prohibit the union from giving publicity for the facts of the labor dispute unless there is fraud or violence. There has been no violence. . . . There has been no threats. They say people were harassed and asked if they wanted to join the union. That's neither harassment, nor is it a threat.

Tr. at 145:24-146:9 (Court). The Carpenters' Union also repeated its argument that the Court cannot issue an injunction against its handbilling and bannering, because both the Norris-LaGuardia Act and the First Amendment protect that activity. See Tr. at 146:11-18 (Shanley); Tr. at 147:19-22 (Shanley). The Carpenters' Union argued that "state law does not govern this injunction request," Tr. at 147:2-3 (Shanley), and that <u>Retail Property Trust v. United Bhd. of Carpenters and Joiners of Am.</u>, 768 F.3d 938, on which Firebird Structures relies, is inapposite, "because <u>Retail Properties</u> is not an injunction case," Tr. at 147:3-4 (Shanley).

56. The Carpenters' Union then summarized its view of what Firebird Structures had shown:

> [T]here was one window that was broken. . . . They said there were screws one time. [Cannedy said] there were screws on a second job, but nobody can testify to that . . . [none] of their witnesses had any personal knowledge of that. . . . With respect to the union parking across the street, there is nothing unlawful about that. There is nothing unlawful about the union taking pictures.

Tr. at 148:3-9 (Shanley)(alterations added); <u>id.</u> at 148:20-23 (Shanley). The Carpenters' Union then stated:

> They want us to stop trespassing or parking vehicles on their property. . . . [W]e did it one time, and they were parked across the street. . . . They want us to stop interfering with their employees and their general contractors, everything else. That is so broad, it means the union couldn't give out a flyer . . . . [T]hey want us to stop . . . going to and from the construction site. Well, we're not interfering. We have a right to ask people if they want to join the union.

Tr. at 150:19-151:16 (Shanley).

57.     The Carpenters' Union concluded that the Court is without jurisdiction to issue an injunction, because (i) Firebird Structures sought injunctive relief "with unclean hands," Tr. at 149:9 (Shanley); and (ii) Firebird Structures has not complied with the Norris-LaGuardia Act's § 8, see Tr. at 149:22-23 (Shanley); Tr. at 152:1-2 (Shanley).  The Court then confirmed that "the date of the nail incident" was February 22, 2017.  Tr. at 152:7-10 (Court, Mier).

58.     Firebird Structures employed its rebuttal argument to address the purpose of the Norris-LaGuardia Act: "to keep courts from enjoining unions from picketing and bannering, and doing the things that unions are allowed to do . . . ."  Firebird Structures argued that the Norris-LaGuardia Act "did not envision protecting against unlawful behavior."  Tr. at 152:18-22 (Thomas).  Firebird Structures then asserted that "Norris-LaGuardia does not apply to state court tort actions[:] trespass, nuisance, [and] harassment."  Tr. at 152:18-22 (Thomas).  The Court then inquired as to the number of times Firebird Structures called the police regarding the behavior they attribute to the Carpenters' Union.  See Tr. at 154:10-11 (Court).  Firebird Structures represented that "it was more than four in the last month."  Tr. at 154:12-13 (Thomas).  The Court also inquired how many times "the screws were there."  Tr. at 155:1 (Court).  Firebird Structures represented twice.  See Tr. at 155:2 (Thomas).  Firebird Structures then repeated the essence of its application:

> [T]he union . . . can't damage property.  It can't throw screws under our tires. They can't harass.  They can't intimidate.  They can't sit outside the owner's house at midnight taking pictures, . . . stalking, following people home, gong to workers' houses at night consistently, after they've said to leave them alone.

Tr. at 155:24-156:5 (Thomas).  Firebird Structures then repeated its request for an injunction "to observe the status quo, to not intimidate, not harass, not damage property, not trespass, not stalk, not follow home, for the duration of their dispute."  Tr. at 156:19-22 (Thomas).  See Tr. at 157:3-4 (Thomas)("[W]e would asked the Court to enter an order to that effect.").

59.     The Court took the Motion under advisement.  See Tr. at 159:7-8 (Court).

## LAW REGARDING FEDERAL QUESTION JURISDICTION

1.      Federal courts have limited jurisdiction, and there is a presumption against the existence of federal jurisdiction.  See Basso v. Utah Power & Light Co., 495 F.2d 906, 909 (10th Cir. 1974).  A federal district court has "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."  28 U.S.C. § 1331.  There is a federal question if the case arises under the Constitution, laws, or treatises of the United States.  See 28 U.S.C. § 1331.

### 1.     **The Well-Pleaded Complaint Rule.**

2.      Whether a case arises under a federal law is determined by the "well-pleaded complaint rule," Franchise Tax Bd. of State of Cal. v. Construction Laborers Vacation Trust for Southern Cal., 463 U.S. 1, 9 (1983)("Franchise Tax Bd."), specifically, when "a federal question is presented on the face of the plaintiff's properly pleaded complaint," Caterpillar, Inc. v. Williams, 482 U.S. 386, 392 (1987)(citing Gully v. First Nat'l Bank, 299 U.S. 109, 112-113 (1936)).  This determination is made by examining the plaintiff's complaint, "unaided by anything alleged in anticipation of avoidance of defenses which it is thought the defendant may interpose."  Franchise Tax Bd., 463 U.S. at 10 (citing Taylor v. Anderson, 234 U.S. 74, 75-76 (1914)).  The Supreme Court of the United States has further limited subject-matter jurisdiction by requiring that the federal law relied on in the plaintiff's complaint creates a private cause of action.  See Franchise Tax Bd., 463 U.S. at 25-26.  The Supreme Court has emphasized that "the mere presence of a federal issue in a state cause of action does not automatically confer federal-question jurisdiction."  Merrell Dow Pharmaceuticals, Inc. v. Thompson, 478 U.S. 804, 813 (1986).  See Sandoval v. New Mexico Technology Group, L.L.C., 174 F. Supp. 2d 1224, 1232

n.5 (D.N.M. 2001)(Smith, M.J.)("<u>Merrell Dow</u> is the controlling law when invoking subject matter jurisdiction" and when a right under state law turns on construing federal law).  District courts must exercise "prudence and restraint" when determining whether a state cause of action presents a federal question, because "determinations about federal jurisdiction require sensitive judgments about congressional intent, judicial power, and the federal system."  <u>Merrell Dow Pharmaceuticals, Inc. v. Thompson</u>, 478 U.S. at 810.

      3.     In addition to the requirement that the federal question appear on the face of the complaint, "plaintiff's cause of action must either be (1) created by federal law, or (2) if it is a state-created cause of action, 'its resolution must necessarily turn on a substantial question of federal law.'"  <u>Nicodemus v. Union Pacific Corp.</u>, 318 F.3d 1231, 1235 (10th Cir. 2003)(quoting <u>Rice v. Office of Servicemembers' Group Life Ins.</u>, 260 F.3d 1240, 1245 (10th Cir. 2001)).  If the resolution turns on a substantial question of federal law, the federal question must also be "contested."  <u>Grable & Sons Metal Products Inc. v. Darue Engineering & Mfg.</u>, 545 U.S. 308, 313 (2005)("<u>Grable & Sons</u>").  Finally, the exercise of federal-question jurisdiction must also be "consistent with congressional judgment about the sound division of labor between state and federal courts governing § 1331's application."  <u>Grable & Sons</u>, 545 U.S. at 313.  Particularly, the Court must determine whether recognition of federal-question jurisdiction will federalize a "garden variety" state-law claim that will result in the judiciary being bombarded with cases traditionally heard in state courts.  <u>Grable & Sons</u>, 545 U.S. at 318.  <u>See</u> <u>Bonadeo v. Lujan</u>, No. CIV 08-0812 JB/ACT, 2009 WL 1324119, at *7-9 (D.N.M. Apr. 30, 2009)(Browning, J.).

      **2.**     **<u>The Complete-Preemption Exception to the Well-Pleaded Complaint Rule</u>.**

      4.     "As a general rule, absent diversity jurisdiction, a case will not be removable if the complaint does not affirmatively allege a federal claim."  <u>Beneficial Nat'l Bank v. Anderson</u>,

539 U.S. 1, 6 (2003). As the Supreme Court has explained, the well-pleaded complaint rule means that "a case may <u>not</u> be removed to federal court on the basis of a federal defense, including the defense of pre-emption, even if the defense is anticipated in the plaintiff's complaint, and even if both parties concede that the federal defense is the only question truly at issue." <u>Caterpillar Inc. v. Williams</u>, 482 U.S. at 393 (emphasis in original). The Supreme Court has long held:

> It is the settled interpretation of these words, as used in this statute, conferring jurisdiction, that a suit arises under the Constitution and laws of the United States only when the plaintiff's statement of his own cause of action shows that it is based upon those laws or that Constitution. It is not enough that the plaintiff alleges some anticipated defense to his cause of action, and asserts that the defense is invalidated by some provision of the Constitution of the United States. Although such allegations show that very likely, in the course of the litigation, a question under the Constitution would arise, they do not show that the suit, that is, the plaintiff's original cause of action, arises under the Constitution.

<u>Louisville & Nashville R. Co. v. Mottley</u>, 211 U.S. 149, 152 (1908).

5. The Supreme Court has recognized the "complete pre-emption doctrine" as an "independent corollary" and exception to the well-pleaded complaint rule. <u>Caterpillar Inc. v. Williams</u>, 482 U.S. at 393. <u>See generally</u> 14B, Charles Alan Wright & Arthur R. Miller, et al., <u>Federal Practice and Procedure</u>, § 3722.2, at 399-583 (4th ed. 2009)(discussing "removal based on complete preemption"). "That doctrine posits that there are some federal statutes that have such 'extraordinary pre-emptive power' that they 'convert[ ] an ordinary state common law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule.'" <u>Retail Prop. Trust</u>, 768 F.3d at 947-48 (alterations original)(quoting <u>Metro. Life Co. v. Taylor</u>, 481 U.S. 58, 65 (1987)). "Once an area of state law has been completely pre-empted, any claim purportedly based on that pre-empted state law is considered, from its inception, a federal claim, and therefore arises under federal law." <u>Caterpillar Inc. v. Williams</u>, 482 U.S. at 393.

Consequently, "[w]hen a plaintiff raises such a completely preempted state-law claim in his complaint, a court is obligated to construe the complaint as raising a federal claim and therefore 'arising under' federal law." Sullivan v. Am. Airlines, Inc., 424 F.3d 267, 272 (2d Cir. 2005)(alteration added).

6.      The United States Court of Appeals for the Tenth Circuit, following the Supreme Court's direction, has also recognized the "complete pre-emption doctrine" as a defense to the well-pleaded complaint rule. See, e.g., Felix v. Lucent Techs., Inc., 387 F.3d 1146, 1154-56 (10th Cir. 2004)(discussing Aetna Health Inc. v. Davila, 542 U.S. 200 (2004), and citing Caterpillar Inc. v. Williams, 482 U.S. at 393)). Additionally, the United States Court of Appeals for the Ninth Circuit has explained:

> "Complete preemption is really a jurisdictional rather than a preemption doctrine, as it confers exclusive federal jurisdiction in certain instances where Congress intended the scope of federal law to be so broad as to entirely replace any state-law claim. Complete preemption is a limited doctrine that applies only where a federal statutory scheme is so comprehensive that it entirely supplants state law causes of action."

Retail Prop. Trust, 768 F.3d at 947 (alteration added)(quoting Dennis v. Hart, 724 F.3d 1249, 1254 (9th Cir. 2013). The Ninth Circuit has also noted that the occurrence of complete preemption is "rare," ARCO Envtl. Remediation, LLC v. Mont. Dep't of Health & Envtl. Quality, 213 F.3d 1108, 1114 (9th Cir. 2000), and "the Supreme Court has recognized only three instances of 'complete jurisdiction,'" Retail Prop. Trust, 768 F.3d at 956 (citing Beneficial Nat'l Bank v. Anderson, 539 U.S. at 7-11 (recognizing §§ 85 and 86 of the National Bank Act, 12 U.S.C. §§ 85, 86, as a basis for complete preemption); Metro. Life Co. v. Taylor, 481 U.S. at 65-67 (recognizing § 502(a) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a), as a basis for complete preemption); Avco Corp. v. Aero Lodge No. 735, Int'l Ass'n of Machinists, 390 U.S. 557, 558-62 (1968)(recognizing § 301 of the

LMRA, 29 U.S.C. § 187, as a basis for complete preemption)). *See* <u>Carroll v. City of Albuquerque</u>, 749 F. Supp. 2d 1216, 1223 (D.N.M. 2010)(Browning, J.)("The Supreme Court of the United States has recognized complete preemption as to three federal laws: (i) the LMRA, 29 U.S.C. § 185; (ii) the National Bank Act, 12 U.S.C. §§ 85, 86, and (iii) the Employment Retirement Income Security Act of 1974, 29 U.S.C. § 1132.")(citations omitted).

## LAW REGARDING SUPPLEMENTAL JURISDICTION

7.  The federal-question requirement does not prohibit the federal courts from ever hearing a state-law claim.

> Pendent jurisdiction, in the sense of judicial power, exists whenever there is a claim "arising under [the] Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority . . . ," and the relationship between that claim and the state claim permits the conclusion that the entire action before the court comprises but one constitutional "case." The federal claim must have substance sufficient to confer subject matter jurisdiction on the court. The state and federal claims must derive from a common nucleus of operative fact. But if, considered without regard to their federal or state character, a plaintiff's claims are such that he would ordinarily be expected to try them all in one judicial proceeding, then, assuming substantiality of the federal issues, there is power in federal courts to hear the whole.

<u>Gibbs</u>, 383 U.S. at 725 (alterations original)(quoting U.S. Const. art. III, § 2)(citing <u>Levering & Garrigues Co. v. Morrin</u>, 289 U.S. 103, 105 (1933)).

8.  In considering supplemental state claims, the Tenth Circuit has followed the Supreme Court's lead in classifying supplemental jurisdiction not as a party's right, but as a matter of judicial discretion. *See* <u>Estate of Harshman v. Jackson Hole Mountain Resort Corp.</u>, 379 F.3d 1161, 1165 (10th Cir. 2004)(citing <u>City of Chicago v. Int'l College of Surgeons</u>, 522 U.S. 156, 173 (1997); <u>Gibbs</u>, 383 U.S. at 726). In circumstances where the supplemental jurisdiction statute may support supplemental jurisdiction, the district court retains discretion to decline to exercise that jurisdiction. *See* <u>Estate of Harshman v. Jackson Hole Mountain Resort</u>

Corp., 379 F.3d at 1165.  The supplemental jurisdiction statute enumerates four factors that the court should consider in whether to decline jurisdiction:

> (1) the claim raises a novel or complex issue of State law,
>
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
>
> (3) the district court has dismissed all claims over which it has original jurisdiction, or
>
> (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c).  28 U.S.C. § 1367(c) changed the district courts' supplemental jurisdiction discretion analysis to prohibit courts from declining jurisdiction unless one of the conditions of 28 U.S.C. § 1367(c) exists.  See Mirzai v. State of N.M. Gen. Servs. Dep't, 506 F. Supp. 2d 767, 779 (D.N.M. 2007)(Browning, J.); Gudenkauf v. Stauffer Commc'ns, Inc., 896 F. Supp. 1082, 1084 (D. Kan. 1995)(Crow, J.).

    9.    Nevertheless, where state issues substantially predominate, those claims may be left for resolution by the state tribunal.  See Gibbs, 383 U.S. at 726-27; 28 U.S.C. § 1367(c).  In cases in which some of the causes of action in a complaint are removable as claims arising under the original jurisdiction of the federal courts but other causes of action do not and are not independently removable, 28 U.S.C. § 1441(c) provides that "the entire case may be removed and the district court may determine all issues therein, or, in its discretion, may remand all matters in which State law predominates."  The Supreme Court has held that "the animating principle behind the pendent jurisdiction doctrine supports giving a district court discretion to remand when the exercise of pendent jurisdiction is inappropriate."  Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 351 (1988).  See Bonadeo v. Lujan, 2009 WL 1324119, at *7-9.

**LAW REGARDING REMOVAL TO FEDERAL COURT**

10.     "If a civil action filed in state court satisfies the requirements for original federal jurisdiction, the defendant may invoke 28 U.S.C. § 1441(a) to remove the action to the federal district court 'embracing the place where such action is pending.'" Thompson v. Intel Corp., No. CIV 12-0620 JB/LFG, 2012 WL 3860748, at *4 (D.N.M. Aug. 27, 2012)(Browning, J.)(citing 28 U.S.C. § 1441(a)). See Huffman v. Saul Holdings Ltd. P'ship., 194 F.3d 1072, 1076 (10th Cir. 1999). Defendants may remove a civil action to federal court where the district court would have original jurisdiction over the case based upon diversity of citizenship. See Huffman v. Saul Holdings Ltd. P'ship., 194 F.3d at 1076 (quoting Caterpillar Inc. v. Lewis, 519 U.S. 61, 68 (1996)). Nonetheless, a presumption against removal jurisdiction exists, and federal courts "are to . . . narrowly [construe removal statutes] in light of our constitutional role as limited tribunals." Pritchett v. Office Depot, Inc., 420 F.3d 1090, 1095 (10th Cir. 2005)(alterations added)(citing Shamrock Oil & Gas Corp. v. Sheets, 313 U.S. 100, 108-09 (1941); United States ex rel. King v. Hillcrest Health Ctr., 264 F.3d 1271, 1280 (10th Cir. 2001)). "All doubts are to be resolved against removal." Fajen v. Found. Reserve Ins. Co., 683 F.2d 331, 333 (10th Cir. 1982). The defendant seeking to remove an action to federal court bears the burden of establishing the district court's subject-matter jurisdiction over the case. See Montoya v. Chao, 296 F.3d 952, 955 (10th Cir. 2002); Carrillo v. MCS Indus., Inc., No. CIV 12-0573 JB/WPL, 2012 WL 5378300, at *6-9 (D.N.M. Oct. 15, 2012)(Browning, J).

1.     **The Presumption Against Removal.**

11.     Federal courts are courts of limited jurisdiction; thus, there is a presumption against removal jurisdiction which must be overcome by the defendant seeking removal. See Laughlin v. Kmart Corp., 50 F.3d 871, 873 (10th Cir. 1995); Fajen v. Found. Reserve Ins. Co.,

683 F.2d at 333; <u>Martin v. Franklin Capital Corp.</u>, 251 F.3d 1284, 1290 (10th Cir. 2001); <u>Bonadeo v. Lujan</u>, 2009 WL 1324119, at *4 ("Removal statutes are strictly construed, and ambiguities should be resolved in favor of remand."). The defendant seeking removal must establish that federal court jurisdiction is proper "by a preponderance of the evidence." <u>McPhail v. Deere & Co.</u>, 529 F.3d 947, 953 (10th Cir. 2008). <u>See also</u> <u>Bonadeo v. Lujan</u>, 2009 WL 1324119, at *4 ("As the removing party, the defendant bears the burden of proving all jurisdictional facts and of establishing a right to removal."). Because federal courts are courts of limited jurisdiction, the Tenth Circuit has ruled that "courts must deny such jurisdiction if not affirmatively apparent on the record." <u>Okla. Farm Bureau Mut. Ins. Co. v. JSSJ Corp.</u>, 149 F. App'x 775, 778 (10th Cir. 2005). <u>See</u> <u>Carrillo v. MCS Indus., Inc.</u>, 2012 WL 5378300, at *6-9.

**2.      Procedural Requirements for Removal.**

12.      Section 1446 of Title 28 of the United States Code governs the procedure for removal. <u>See</u> 28 U.S.C. § 1446. "Because removal is entirely a statutory right, the relevant procedures to effect removal must be followed." <u>Thompson v. Intel Corp.</u>, 2012 WL 3860748, at *5. A removal which does not comply with the express statutory requirements is defective and must be remanded to state court. <u>See</u> <u>Huffman v. Saul Holdings Ltd. P'ship</u>, 194 F.3d at 1077. <u>See also</u> <u>Chavez v. Kincaid</u>, 15 F. Supp. 2d 1118, 1119 (D.N.M. 1998)(Campos, J.)("The [r]ight to remove a case that was originally in state court to federal court is purely statutory, not constitutional.").

13.      Section 1446(a) of Title 28 of the United States Code provides that a party seeking removal of a matter to federal court shall file a notice of removal in the district and division where the state action is pending, "containing a short and plain statement of the grounds for removal, together with a copy of all process, pleadings, and orders served upon such

defendant or defendants in such action." 28 U.S.C. § 1446(a). Such notice of removal is proper if filed within thirty days from the date when the case qualifies for federal jurisdiction. See 28 U.S.C. § 1446(b); Caterpillar Inc. v. Lewis, 519 U.S. at 68-69. The Tenth Circuit has further elaborated that, for the thirty-day period to begin to run, "this court requires clear and unequivocal notice from the [initial] pleading itself" that federal jurisdiction is available. Akin v. Ashland Chem. Co., 156 F.3d 1030, 1036 (10th Cir. 1998). The Tenth Circuit specifically disagrees with "cases from other jurisdictions which impose a duty to investigate and determine removability where the initial pleading indicates that the right to remove may exist." Akin v. Ashland Chem. Co., 156 F.3d at 1036. See Carrillo v. MCS Indus., Inc., 2012 WL 5378300, at *6-9.

### 3. **Amendment of the Notice of Removal.**

14. In Caterpillar, Inc. v. Lewis, the Supreme Court held that a defect in subject-matter jurisdiction cured before entry of judgment did not warrant reversal or remand to state court. See 519 U.S. at 70-78. Similarly, citing Caterpillar, Inc. v. Lewis, 519 U.S. at 77, the Tenth Circuit has held that "a defect in removal procedure, standing alone, is not sufficient to warrant vacating judgment and remand to state court if subject matter jurisdiction existed in the federal court." Browning v. Am. Family Mut. Ins. Co., 196 F. App'x 396, 505-06 (10th Cir. 2010)(citing Caterpillar v. Lewis, 519 U.S. at 77). In McMahon v. Bunn-O-Matic Corp., 150 F.3d 651 (7th Cir. 1998), the United States Court of Appeals for the Seventh Circuit noticed on appeal defects in the notice of removal, including that the notice failed to properly allege diversity of citizenship. See 150 F.3d at 653 ("As it happens, no one paid attention to subject-matter jurisdiction . . . ."). The Seventh Circuit permitted the defective notice of removal to be amended on appeal to properly establish subject-matter jurisdiction. See 150 F.3d at 653-54.

15.     The Tenth Circuit has allowed defendants to remedy defects in their petition or notice of removal.    See Jenkins v. MTGLQ Investors, 218 F. App'x. 719, 723 (10th Cir. 2007)(granting unopposed motion to amend notice of removal to properly allege jurisdictional facts); Watkins v. Terminix Int'l Co., Nos. CIV 96-3053, 96-3078, 1997 WL 34676226, at *2 (10th Cir. May 22, 1997)(per curiam)(reminding the defendant that, on remand, it should move to amend the notice of removal to properly allege jurisdictional facts); Lopez v. Denver & Rio Grande W.R.R. Co., 277 F.2d 830, 832 (10th Cir. 1960)("Appellee's motion to amend its petition for removal to supply sufficient allegations of citizenship and principal place of business existing at the time of commencement of this action is hereby granted, and diversity jurisdiction is therefore present.").

16.     The Tenth Circuit has further reasoned that disallowing amendments to the notice of removal, even after the thirty-day removal window had expired, when the defendant made simple errors in its jurisdictional allegations, "would be too grudging with reference to the controlling statute, too prone to equate imperfect allegations of jurisdiction with the total absence of jurisdictional foundations, and would tend unduly to exalt form over substance and legal flaw-picking over the orderly disposition of cases properly committed to federal courts." Hendrix v. New Amsterdam Cas. Co., 390 F.2d 299, 301 (10th Cir. 1968). The Tenth Circuit noted that a simple error in a jurisdictional allegation included failing to identify a corporation's principal place of business or referring to an individual's state of residence rather than citizenship. Hendrix v. New Amsterdam Cas. Co., 390 F.2d at 301. In McEntire v. Kmart Corp., No. CIV 09-0567, 2010 WL 553443 (D.N.M. Feb. 9, 2010)(Browning, J.), when faced with insufficient allegations in the notice of removal -- allegations of "residence" not "citizenship" -- the Court granted the defendants leave to amend their notice of removal to cure the errors in some of the

"formalistic technical requirements."  2010 WL 553443, at *8 (citing Hendrix v. New Amsterdam Cas. Co., 390 F.2d at 300-02).  Further, in Thompson v. Intel Corp., the Court permitted the defendant Intel Corp. to amend its notice of removal to include missing jurisdictional elements, including evidence that its principal place of business and corporate headquarters -- the center of Intel Corp.'s direction, control, and coordination of activities -- is out of state, so that the diversity requirements were met.  See 2012 WL 3860748, at *1.

17.     There are limits to the defects which an amended notice of removal may cure, as Professors Wright and Miller have explained:

> [A]n amendment of the removal notice may seek to accomplish any of several objectives: It may correct an imperfect statement of citizenship, state the previously articulated grounds more fully, or clarify the jurisdictional amount. In most circumstances, however, defendants may not add completely new grounds for removal or furnish missing allegations, even if the court rejects the first-proffered basis of removal, and the court will not, on its own motion, retain jurisdiction on the basis of a ground that is present but that defendants have not relied upon.

14 Federal Practice and Procedure, § 3733, at 651-659 (footnotes omitted).  Professor Moore has similarly recognized: "[A]mendment may be permitted after the 30-day period if the amendment corrects defective allegations of jurisdiction, but not to add a new basis for removal jurisdiction." 16 James William Moore, Moore's Federal Practice, § 107.30[2][a][iv], at 107-184 (3d ed. 2012).  Thus, where diversity jurisdiction is asserted as a basis for removal of an action to federal court, the district court may permit the removing defendant to amend its removal notice, if necessary, to fully allege facts which satisfy the requirements of diversity jurisdiction by a preponderance of the evidence.  See Carrillo v. MCS Indus., Inc., 2012 WL 5378300, at *6-9.

### 4.     Consideration of Post-Removal Evidence.

18.     As the Court has previously explained, the Tenth Circuit looks to both evidence in the complaint, and submitted after the complaint, in determining whether the criteria necessary

for removal are met.  See Thompson v. Intel Corp., 2012 WL 3860748, at *8 (citing McPhail v. Deere & Co., 529 F.3d at 956).  The Tenth Circuit explained in McPhail v. Deere & Co. that a district court may have evidence presented to a district court after a notice of removal has been filed, even if produced at a hearing on subject-matter jurisdiction, to determine if the jurisdictional requirements are met.  See 529 F.3d at 593.  "[B]eyond the complaint itself, other documentation can provide the basis for determining the amount in controversy -- either interrogatories obtained in state court before removal was filed, or affidavits or other evidence submitted in federal court afterward."  529 F.3d at 593 (citing Meridian Secs. Ins. Co. v. Sadowski, 441 F.3d 536, 541-42 (7th Cir. 2006), and Manguno v. Prudential Prop. & Cas. Ins. Co., 276 F.3d 720, 723 (5th Cir. 2002)).  As this Court has explained, "the Seventh Circuit, on which the Tenth Circuit has heavily relied when addressing the amount in controversy, has recognized that 'events subsequent to removal may clarify what the plaintiff was actually seeking when the case was removed.'"  Aranda v. Foamex Int'l, No. CIV 12-0405 JB/ACT, 2012 WL 2923183, at *18 (D.N.M. July 11, 2012)(Browning, J.)(quoting Carroll v. Stryker Corp., 658 F.3d 675, 681 (7th Cir. 2011)).  Thus, when determining if the requirements for federal jurisdiction are met in a matter removed from state court, a district court may consider evidence submitted after removal.  See Thompson v. Intel Corp., 2012 WL 3860748, at *14 ("[I]t is appropriate to consider post-removal evidence to determine whether subject-matter jurisdiction exists."); Carrillo v. MCS Indus., Inc., 2012 WL 5378300, at *6-9.

**LAW REGARDING REQUESTS FOR A TEMPORARY RESTRAINING ORDER**

19.	The requirements for the issuance of a TRO are essentially the same as those for the issuance of a preliminary injunction.  See Herrera v. Santa Fe Pub. Sch., 792 F. Supp. 2d at 1181; 13 Moore's Federal Practice ¶ 65.36(1), at 65-83 (3d ed. 2004).  The primary difference

between a TRO and a preliminary injunction is that a TRO may issue without notice to the opposing party and that a TRO is of limited duration.  See Fed. R. Civ. P. 65(b).  In both cases, however, injunctive relief is an "extraordinary remedy," and the movant must demonstrate a "clear and unequivocal right" to have a request granted.  Leviton Mfg. Co., Inc. v. Nicor, Inc., No. CIV 04-0424 JB/RHS, 2007 WL 505796, at *3 (D.N.M. January 8, 2007)(Browning, J.)(citing Greater Yellowstone Coalition v. Flowers, 321 F.3d 1250, 1256 (10th Cir. 2003)).  See Herrera v. Santa Fe Pub. Sch., 792 F. Supp. 2d at 1181.  The Supreme Court and the Tenth Circuit have explained that "[t]he purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held."  Univ. of Texas v. Camenisch, 451 U.S. 390, 395 (1981).  See Keirnan v. Utah Transit Auth., 339 F.3d 1217, 1220 (10th Cir.2003)("'In issuing a preliminary injunction, a court is primarily attempting to preserve the power to render a meaningful decision on the merits.'")(quoting Tri-State Generation & Transmission Ass'n v. Shoshone River Power, Inc., 805 F.2d 351, 355 (10th Cir. 1986)).

20.     To establish its right to preliminary relief under rule 65(b), a moving party must demonstrate that "immediate and irreparable injury, loss, or damage will result" unless the order is issued.  Fed. R. Civ. P. 65(b).  A moving party must "establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008)("Winter")(citing Munaf v. Geren, 553 U.S. 674, 689-690 (2008)); Amoco Prod. Co. v. Gambell, 480 U.S. 531, 542 (1987); Weinberger v. Romero-Barcelo, 456 U.S. 305, 311-312 (1982)).

21.     In other words, in determining whether to grant injunctive relief, the Court

considers the following four factors:

> (i) whether the moving party will suffer irreparable injury unless the injunction issues; (ii) whether there is a substantial likelihood that the moving party will eventually prevail on the merits; (iii) whether the threatened injury to the moving party outweighs whatever damage the proposed injunction may cause the opposing party; and (iv) whether the injunction, if issued, would not be adverse to the public interest.

Herrera v. Santa Fe Pub. Sch., 792 F. Supp. 2d at 1181 (citing Resolution Trust Corp. v. Cruce, 972 F.2d 1195, 1198 (10th Cir. 1992); Fed. Lands Legal Consortium ex rel. Robart Estate v. United States, 195 F.3d 1190, 1194 (10th Cir. 1999)).

22.    The likelihood-of-success and irreparable-harm factors are "the most critical" in the analysis. Nken v. Holder, 556 U.S. 418, 434 (2009). It is insufficient, moreover, that a moving party demonstrate that there is only a "possibility" of either success on the merits or irreparable harm. Dine Citizens Against Ruining Our Env't v. Jewell, 839 F.3d 1276 (10th Cir. 2016)("Dine"). In Dine, the Tenth Circuit held that a relaxed test for preliminary relief is "inconsistent with the Supreme Court's recent decision in *Winter v. Natural Resources Defense Council*," which "overruled the [United States Court of Appeals for the] Ninth Circuit's application of a modified preliminary injunction test under which plaintiffs . . . could receive a preliminary injunction based only on a possibility, rather than a likelihood, of irreparable harm." Dine, 839 F.3d at 1282 (citing Winter, 555 U.S. at 22). The Tenth Circuit concluded that, although the standard overruled in Winter v. Natural Resources Defense Council, Inc. dealt with the irreparable-harm factor, "*Winter's* rationale seems to apply with equal force" to the likelihood-of-success factor. Dine, 839 F.3d at 1282. Accordingly, the Tenth Circuit held that "any modified test which relaxes one of the prongs for preliminary relief and thus deviates from the standard test is impermissible." Dine, 839 F.3d at 1282.

## LAW REGARDING THE COURT'S JURISDICTION TO ISSUE INJUCTIVE RELIEF UNDER THE NORRIS-LAGUARDIA ACT

23.     In 1932, Congress enacted the Norris-LaGuardia Act, 29 U.S.C. §§ 101-115.  The

Norris-LaGuardia Act greatly restrains the federal courts' jurisdiction to issue injunctive relief in

labor disputes.  See 29 U.S.C. § 101.  Section 1 of the Norris-LaGuardia Act makes this restraint

plain:

> No court of the United States, as defined in this chapter, shall have jurisdiction to issue any restraining order or temporary or permanent injunction in a case involving or growing out of a labor dispute, except in a strict conformity with the provisions of this chapter; nor shall any such restraining order or temporary or permanent injunction be issued contrary to the public policy declared in this chapter.

29 U.S.C. § 101.[10]  Although the Norris-LaGuardia Act restricts federal jurisdiction to issue

injunctions in labor disputes, the Norris-LaGuardia Act does not completely proscribe that

power.  See, e.g., Boys Markets, Inc. v. Retail Clerks Union, Local 770, 398 U.S. 235, 253

(1970)(recognizing an exception to the Norris-LaGuardia Act's anti-injunction provisions when

an employer brings suit under section 301(a) of the LMRA to enforce a labor union's contractual

obligation to arbitrate grievances).  The Norris-LaGuardia Act provides, however, clear rules

regarding the federal courts' jurisdiction to issue injunctions arising out of labor disputes against

labor unions.  See 29 U.S.C. §§ 103-109, 113.

24.     The Supreme Court explained that the Norris-LaGuardia Act's primary purpose

---

[10]It is basic that Congress has "the power to define and limit the jurisdiction of the inferior courts of the United States."  Lauf v. E.G. Shinner & Co., 303 U.S. 323, 330 (1938). See, e.g., City of Arlington, Tex. v. F.C.C., 133 S. Ct. 1863, 1868-69 (2013)("Congress has the power (within limits) to tell the courts what classes of cases they may decide . . . .")(citations omitted); Kline v. Burke Constr. Co., 260 U.S. 226, 234 (1922)("Only the jurisdiction of the Supreme Court is derived directly from the Constitution.  Every other court created by the general government derives its jurisdiction wholly from the authority of Congress."); Sheldon v. Sill, 49 U.S. 441, 449 (1850)("Congress may withhold from any court of its creation jurisdiction of any of the enumerated controversies.  Courts created by statute can have no jurisdiction but such as the statute confers.").

"was to restrict the federal equity power in such matters within greatly narrower limits than it had come to occupy" in labor struggles before its enactment. Bhd. of R.R. Trainmen, Enter. Lodge, No. 27, v. Toledo, P. & W. R. R., 321 U.S. 50, 58 (1944)("Bhd. of R.R. Trainmen")(citing 75 Cong. Rec. 4505-4510, 4618-4626, 5462-5515). The Norris-LaGuardia Act "sought to make injunction a last line of defense available not only after other legally required methods, but after all reasonable methods as well, have been tried and found wanting." Bhd. of R.R. Trainmen, 321 U.S. at 58-59.

> "Because the Norris-LaGuardia Act operated solely to restrict federal judicial intervention in labor disputes, it has been said that the point of the Act 'is not what it does for organized labor but is what it permits organized labor to do for itself without judicial interference." . . . Through the medium of eliminating judicial interference, the statute was designed to promote employer recognition of unions and thus foster the practice of collective bargaining as an institution in the conduct of labor relations.

1 The Developing Labor Law: The Board, the Courts, and the National Labor Relations Act § 1.III.D, at 22 (John E. Higgins Jr. et al. eds., 6th ed. 2012)("The Developing Labor Law")(alteration added)(quoting Gregory & Katz, Labor and the Law (3d ed. 1979)).

25.     The purpose of making an injunction the "last line of defense" of employers and owners of property in the effort to resolve a labor dispute "runs throughout the Act's provisions." Bhd. of R.R. Trainmen, 321 U.S. at 59. In the Norris-LaGuardia Act's declaration of "public policy" that guides "the interpretation of this chapter and in determining the jurisdiction and authority of the courts of the United States," Congress stated:

> Whereas under prevailing economic conditions, developed with the aid of governmental authority for owners of property to organize in the corporate and other forms of ownership association, the individual unorganized worker is commonly helpless to exercise actual liberty of contract and to protect his freedom of labor, and thereby to obtain acceptable terms and conditions of employment, wherefore, though he should be free to decline to associate with his fellows, it is necessary that he have full freedom of association, self-organization, and designation of representatives of his own choosing, to negotiate the terms and

conditions of his employment, and that he shall be free from the interference, restraint, or coercion of employers of labor, or their agents, in the designation of such representatives or in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aid or protection; therefore, the following definitions of and limitations upon the jurisdiction and authority of the courts of the United States are enacted.

29 U.S.C. § 102.[11]

---

[11]The Norris-LaGuardia Act's purpose reflects the statute's role in the history of the fraught interaction between the federal labor and antitrust laws. See The Developing Labor Law § 19.I.C.1, at 1678. The Clayton Antitrust Act, 29 U.S.C. § 52, "first extended federal protection to strikes by providing that the federal courts may not prohibit 'any person or persons, whether singly or in concert, from terminating any relation of employment, or from ceasing to perform any work or labor.'" The Developing Labor Law § 19.I.C.1, at 1678 (quoting 29 U.S.C. § 52). The Supreme Court narrowly interpreted the Clayton Act, thwarting Congress' purpose, reflected in the Clayton Act, to constrain significantly injunctions of union boycott activity, whether it be primary or secondary boycott activity. See Duplex Printing Press Co. v. Deering, 254 U.S. 443, 469 (1921)("Duplex Printing")("But there is nothing in the section to exempt such an organization or its members from accountability where it or they depart from its normal and legitimate objects and engage in an actual combination or conspiracy in restraint of trade."). Justice Brandeis, in a dissent that Justices Holmes and Clarke joined, stated that "the Clayton Act substituted the opinion of Congress as to the propriety of the purpose [of labor strikes] for that of differing judges; and thereby it declared that the relations between employers of labor and workingmen were competitive relations, that organized competition was not harmful and that it justified injuries necessarily inflicted in its course." Duplex Printing Press Co. v. Deering, 254 U.S. at 486 (Brandeis, J.)(dissenting)(citation omitted). In the Norris-LaGuardia Act, Congress subsequently adopted the view of the Duplex Printing dissenters that labor was exempted from the operation of the antitrust laws. Congress provided:

No court of the United States shall have jurisdiction to issue a restraining order or temporary or permanent injunction on the ground that any of the persons participating or interested in a labor dispute constitute or are engaged in an unlawful combination or conspiracy because of the doing in concert of the acts enumerated in section 104 of this title [e.g. conducting a labor strike or slowdown].

29 U.S.C. § 105.

Since Duplex Printing, the Supreme Court has recognized this history. See, e.g., Brown v. Pro Football, Inc., 518 U.S. 231, 236 (1996). In Brown v. Pro Football, Inc., the Supreme Court reviewed the history of the intersection between the federal labor and antitrust laws:

As a matter of history, Congress intended the labor statutes (from which the Court has implied the exemption) in part to adopt the views of dissenting Justices in *Duplex Printing Press Co. v. Deering,* which Justices had urged the Court to interpret broadly a different *explicit* "statutory" labor exemption that Congress

26.     In furtherance of Congress' express policy, § 4 of the Norris-LaGuardia Act enumerates specific acts that are not "subject to restraining orders or injunctions." 29 U.S.C. § 104. The Norris-LaGuardia Act provides:

No court of the United States shall have jurisdiction to issue any restraining order or temporary or permanent injunction in any case involving or growing out of any labor dispute to prohibit any person or persons participating or interested in such dispute (as these terms are herein defined) from doing, whether singly or in concert, any of the following acts:

(a) Ceasing or refusing to perform any work or to remain in any relation of employment;

(b) Becoming or remaining a member of any labor organization or of any employer organization, regardless of any such undertaking or promise as is described in section 103 of this title;

---

earlier (in 1914) had written directly into the antitrust laws. In the 1930's, when it subsequently enacted the labor statutes, Congress, as in 1914, hoped to prevent judicial use of antitrust law to resolve labor disputes -- a kind of dispute normally inappropriate for antitrust law resolution.

Brown v. Pro Football, Inc., 518 U.S. at 236.

Before Congress enacted the headline federal labor laws, however, it first resurrected its purpose to constrain the power of the federal courts to issue injunctions against labor unions during labor disputes by passing the Norris-LaGuardia Act in 1932. Indeed, sections 6 and 20 of the Clayton Act and the Norris-LaGuardia Act are "[t]he basic sources of organized labor's exemption from federal antitrust laws . . . ." Brown v. Pro Football, Inc., 518 U.S. at 253 n.2 (Stevens, J. dissenting)(citing 15 U.S.C. § 17; 29 U.S.C.    §§ 52, 104, 105 & 113). "These statutes declare that labor unions are not combinations or conspiracies in restraint of trade, and exempt specific union activities, including secondary picketing and boycotts, from the operation of the antitrust laws." Brown v. Pro Football, Inc., 518 U.S. at 253 n.2 (Stevens, J. dissenting)(citing United States v. Hutcheson, 312 U.S. 219 (1941)). In United States v. Hutcheson, the Supreme Court interpreted the Norris-LaGuardia Act "as harmonizing text" alongside § 20 of the Clayton Act and, consequently, interpreted the Clayton Act to reflect its original purpose to exempt labor unions regarding primary and secondary union activity. See United States v. Hutcheson, 312 U.S. at 231-32. The Norris-LaGuardia Act, therefore, repudiated the view expressed in Duplex Printing and vindicates the views of the Duplex Printing dissenters, Justices Brandeis, Holmes, and Clarke, that Congress intended to exempt union boycott activity from the antitrust laws and state laws prohibiting boycotts in restraint of trade, irrespective of whether that activity involves a primary or secondary boycott. See 29 U.S.C. §§ 104, 105 & 113(c). See also The Developing Labor Law § 22.I.B, at 1851.

(c) Paying or giving to, or withholding from, any person participating or interested in such labor dispute, any strike or unemployment benefits or insurance, or other moneys or things of value;

(d) By all lawful means aiding any person participating or interested in any labor dispute who is being proceeded against in, or is prosecuting, any action or suit in any court of the United States or of any State;

(e) Giving publicity to the existence of, or the facts involved in, any labor dispute, whether by advertising, speaking, patrolling, or by any other method not involving fraud or violence;

(f) Assembling peaceably to act or to organize to act in promotion of their interests in a labor dispute;

(g) Advising or notifying any person of an intention to do any of the acts heretofore specified;

(h) Agreeing with other persons to do or not to do any of the acts heretofore specified; and

(i) Advising, urging, or otherwise causing or inducing without fraud or violence the acts heretofore specified, regardless of any such undertaking or promise as is described in section 103 of this title.

29 U.S.C. § 104.

27.     The Norris-LaGuardia Act also limits the imposition of vicarious liability on a union, union officials, or union members for the unlawful acts of individual officers, members, or others.  See 29 U.S.C. § 106; The Developing Labor Law § 1.III.D, at 23.  To this end, the Norris-LaGuardia Act's § 6 provides:

No officer or member of any association or organization, and no association or organization participating or interested in a labor dispute, shall be held responsible or liable in any court of the United States for the unlawful acts of individual officers, members, or agents, except upon clear proof of actual participation in, or actual authorization of, such acts, or of ratification of such acts after actual knowledge thereof.

29 U.S.C. § 106.

28.     Similarly, the Norris-LaGuardia Act's § 7 states that "no injunction or temporary restraining order shall be issued on account of any threat or unlawful act excepting against the person or persons, association, or organization making the threat or committing the unlawful act or actually authorizing or ratifying the same after actual knowledge thereof . . . ." 29 U.S.C. § 107(a).

29.     "Section 6 of the Norris-LaGuardia Act, 29 U.S.C. § 106, applies in federal court adjudications of state tort claims arising out of labor disputes." Fry, 88 F.3d at 841-42 (citing Gibbs, 383 U.S. 715, 737 (1966). Under § 6, "[c]lear proof means proof which is clear, unequivocal, and convincing." Fry, 88 F.3d at 841 (citing Ramsey v. United Mine Workers, 401 U.S. 302, 311 (1971)("Ramsey"); Gibbs, 383 U.S. at 737). "Such proof, together with the statutory requirements of *actual* participation in, or *actual* authorization of unlawful acts, or of ratification of such acts after *actual* knowledge thereof . . . establish a congressionally mandated restrictive test of union responsibility for unlawful acts." Fry, 88 F.3d at 841-42 (emphasis original)(citing 29 U.S.C. § 106; Carbon Fuel Co. v. United Mine Workers, 444 U.S. 212, 217 n.6 (1979). "A preponderance of the evidence is insufficient to survive a motion for summary judgment by the union under the clear proof standard." Fry, 88 F.3d at 842 (citing Gibbs, 383 U.S. at 737, 739; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254 (1986)). See Fleming Bldg. Co. v. Ne. Oklahoma Bldg. & Const. Trades Council, 532 F.2d 162, 164 (10th Cir. 1976)("Fleming")("The preponderance of the evidence standard is applicable in civil actions against labor unions with the exception of those situations triggering the application of § 6 of the Norris-LaGuardia Act which requires the 'clear proof' standard[.]"). See also Gibbs, 383 U.S. at 737 ("Plainly, § 6 applies to federal court adjudications of state tort claims arising out of labor

disputes, whether or not they are associated with claims under § 303 to which the section does not apply.").

30.     In applying the Norris-LaGuardia Act's "clear proof" standard, the Tenth Circuit has stated:

> The terms "participation," "authorization," and "ratification" are fact based, so rules in this area must be general, allowing a case-by-case determination based on the unique facts of each case. In general, however, we adopt principles stated by this court in a related, but not controlling, context.  Under those principles, union liability under § 6 for tortious acts cannot be established by an inference drawn solely from the fact that union members are committing unlawful acts, even in groups and even over a substantial period of time ("mass action" theory).  Nor can liability be established by an inference drawn solely from the fact that the union fails to take affirmative measures to stop such acts ("best efforts" theory).  There must be something more. Thus, while proof of authorization or ratification can be based on circumstantial evidence, [i]n order to satisfy § 6 there must be evidence showing some *definite* and *substantial* connection between the [union] and [the unlawful act(s)].

Fry, 88 F.3d at 842 (alteration original)(emphasis original)(internal quotation marks and citations omitted).

31.     To further ensure that an injunction is an employer's "last line of defense" in the effort to resolve a labor dispute, Bhd. of R.R. Trainmen, 321 U.S. at 58, the Norris-LaGuardia Act's § 8 "denies injunctive relief to any party who has not attempted to settle the dispute by negotiation or resort to available governmental machinery for mediation or voluntary arbitration . . . ."  The Developing Labor Law § 1.III.D, at 23.  The Norris-LaGuardia Act's § 8 provides that "[n]o restraining order or injunctive relief shall be granted to any complainant who . . . has failed to make every reasonable effort to settle such dispute either by negotiation or with the aid of any available governmental machinery of mediation or voluntary arbitration."  29 U.S.C. § 108.

32.     The Norris-LaGuardia Act broadly defines the meaning of "labor dispute," as the Norris-LaGuardia Act uses that term.  See The Developing Labor Law § 1.III.D, at 23 ("The length to which Congress went to promote union organization in the Norris-LaGuardia Act is perhaps most vividly evident in the scope given the Act by the definitional provisions in Section 30.")(citing 29 U.S.C. § 113).  The Act's definitions section, 29 U.S.C. § 113, provides: "When used in this chapter, and for the purposes of this chapter --

> (a) A case shall be held to involve or to grow out of a labor dispute when the case involves persons who are engaged in the same industry, trade, craft, or occupation; or have direct or indirect interests therein; or who are employees of the same employer; or who are members of the same or an affiliated organization of employers or employees; whether such dispute is (1) between one or more employers or associations of employers and one or more employees or associations of employees; (2) between one or more employers or associations of employers and one or more employers or associations of employers; or (3) between one or more employees or associations of employees and one or more employees or associations of employees; or when the case involves any conflicting or competing interests in a "labor dispute" (as defined in this section) of "persons participating or interested" therein (as defined in this section).

> (b) A person or association shall be held to be a person participating or interested in a labor dispute if relief is sought against him or it, and if he or it is engaged in the same industry, trade, craft, or occupation in which such dispute occurs, or has a direct or indirect interest therein, or is a member, officer, or agent of any association composed in whole or in part of employers or employees engaged in such industry, trade, craft, or occupation.

> (c) The term "labor dispute" includes any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employee.

29 U.S.C. § 113(a)-(c).  In light of this statutory language, "[t]he Act was made applicable to any case involving or growing out of a labor dispute."  The Developing Labor Law § 1.III.D, at 23.

## LAW REGARDING § 303 OF THE LABOR MANAGEMENT RELATIONS ACT OF 1947 (THE TAFT-HARTLEY ACT)

33.     In 1947, Congress enacted the Labor Management Relations Act of 1947 ("LMRA"), 29 U.S.C. §§ 141-144, 167, 172-187, informally known as "the Taft-Hartley Act." The Labor Management Relations Act amended the National Labor Relations Act ("NLRA"), 29 U.S.C. §§ 151-169, informally known as "the Wagner Act." The Labor Management Relations Act "shifted the emphasis of federal labor law." The Developing Labor Law § 3.II.A, at 41. The Developing Labor Law provides an overview:

> From an attitude of federal protection for the rights of employees to organize into unions and to engage in concerted economic activity and collective bargaining, the emphasis shifted to a more balanced statutory scheme that added restrictions on unions and also guaranteed certain freedoms of speech and conduct to employers and individual employees.

The Developing Labor Law § 3.II.A, at 41.

34.     In enacting the LMRA, Congress amended section 8 of the NLRA, 29 U.S.C. § 158, and added section 8(b) -- which creates six union unfair labor practices -- in its entirety. See Labor Management Relations Act of 1947, Pub. L. No. 80-101, ch. 120, sec. 101, § 8(b), 61 Stat. 136, 141-142 (1947).   In 1959, Congress enacted the Labor Management Reporting and Disclosure Act of 1959, 29 U.S.C. §§ 401-531, also known as "the Landrum-Griffin Act", which further amended the NLRA's § 8(b) to extend the statute's reach.   See Labor-Management Reporting and Disclosure Act of 1959, Pub. L. No. 86-257, sec. 704, § 8(b)(4), 73 Stat. 519, 542-543 (1959).  In its current form, the NLRA's § 8(b)(4) provides that "[i]t shall be an unfair labor practice for a labor organization or its agents[:]"

> (i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any

person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is --

(A) forcing or requiring any employer or self-employed person to join any labor or employer organization or to enter into any agreement which is prohibited by subsection (e) of this section;

(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 159 of this title: *Provided*, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing;

(C) forcing or requiring any employer to recognize or bargain with a particular labor organization as the representative of his employees if another labor organization has been certified as the representative of such employees under the provisions of section 159 of this title;

(D) forcing or requiring any employer to assign particular work to employees in a particular labor organization or in a particular trade, craft, or class rather than to employees in another labor organization or in another trade, craft, or class, unless such employer is failing to conform to an order or certification of the Board determining the bargaining representative for employees performing such work:

*Provided*, That nothing contained in this subsection shall be construed to make unlawful a refusal by any person to enter upon the premises of any employer (other than his own employer), if the employees of such employer are engaged in a strike ratified or approved by a representative of such employees whom such employer is required to recognize under this subchapter: *Provided further*, That for the purposes of this paragraph (4) only, nothing contained in such paragraph shall be construed to prohibit publicity, other than picketing, for the purpose of truthfully advising the public, including consumers and members of a labor organization, that a product or products are produced by an employer with whom the labor organization has a primary dispute and are distributed by another employer, as long as such publicity does not have an effect of inducing any individual employed by any person other than the primary employer in the course of his employment to refuse to pick up, deliver, or transport any goods, or not to perform any services, at the establishment of the employer engaged in such distribution . . . .

29 U.S.C. § 158(b)(4)(alteration added).

35.     While the NLRA protects or permits most primary union activity, the NLRA regulates secondary activity and, in certain instances, prohibits it.  See 29 U.S.C. §§ 157-158; Burlington N. R. Co. v. Bhd. of Maint. of Way Employees, 481 U.S. 429, 448 (1987)("The NLRA does not contain a 'sweeping prohibition' of secondary activity; instead it 'describes and condemns specific union conduct directed to specific objectives.'")(quoting Carpenters v. NLRB, 357 U.S. 93, 98 (1958)); The Developing Labor Law § 3.II.C, at 43 (explaining that Congress enacted 29 U.S.C. § 158(b)(4) to "outlaw various secondary boycotts" and to make "it an unfair labor practice for a union to force or require assignment of work in a jurisdictional dispute."); The Developing Labor Law § 22.I at 1843 ("By enacting Section 8(b)(4)(B), Congress has prohibited some, but far from all, forms of secondary strikes and picketing."). While the contours separating primary and secondary union activity might be elusive in some applications, the basic distinction between primary and secondary activity is straightforward:

> Unions use handbills, pickets, and strikes to exert economic pressure upon employers.  When the immediate target of such economic pressure is an employer with whom the union has a labor dispute, that employer is the "primary" employer and the handbilling, picketing, and striking are considered primary activity. However, when the handbilling, picketing, or striking is aimed at some other entity with which the primary employer has a business relationship, a "secondary" employer, the object of such pressure usually is to alter that business relationship to the detriment of the primary employer and thereby to raise the cost to the primary employer of continuing the labor dispute. Such handbilling, picketing, and striking is considered secondary activity.

The Developing Labor Law § 22.I at 1843.

36.     LMRA § 303, 29 U.S.C. § 187, creates a private right of action for violations of § 8(b)(4) of the NLRA, 29 U.S.C. § 158(b)(4).  In its current form, LMRA § 303 provides:

(a) It shall be unlawful, for the purpose of this section only, in an industry or activity affecting commerce, for any labor organization to engage in any activity or conduct defined as an unfair labor practice in section 158(b)(4) of this title.

(b) Whoever shall be injured in his business or property by reason or any violation of subsection (a) of this section may sue therefor in any district court of the United States subject to the limitations and provisions of section 185 of this title without respect to the amount in controversy, or in any other court having jurisdiction of the parties, and shall recover the damages by him sustained and the cost of the suit.

29 U.S.C. § 187.

37.     As 29 U.S.C. § 187's language makes plain, there is no liability under that statutory provision unless the plaintiff can demonstrate a violation of the NLRA's § 8(b)(4), 29 U.S.C. § 158(b)(4). See 29 U.S.C. § 187. See also Collier v. Hoisting & Portable Engineers Local Union No. 101, 761 F.2d 600, 602 (10th Cir. 1985)(concluding the existence of sufficient evidence from which jury could have concluded, in action against union for damages, that there were both threats and a prohibited secondary purpose to picketing, contrary to Section 8(b)(4) of the NLRA).  Further, 29 U.S.C. § 187 does not confer jurisdiction on a court to award injunctive relief concerning a violation of Section 8(b)(4) of the NLRA, 29 U.S.C. § 187(b)(4). See San Antonio Cmty. Hosp. v. S. California Dist. Council of Carpenters, 125 F.3d 1230, 1235 (9th Cir. 1997)("[A]n employer cannot seek injunctive relief from a secondary boycott under section 303; only damages are available."); California Ass'n of Employers v. Building and Constr. Trades Council of Reno, 178 F.2d 175, 178 (9th Cir. 1949)("The [LMRA] did not give private litigants the right to obtain injunctive relief even in those situations where a suit for damages was allowed.").  See also Burlington N. R.R. v. Bhd. of Maint. of Way Emps., 481 U.S. 429, 448 (1987)(concluding that because the NLRB has exclusive authority to seek injunctions under the NLRA, "employers are not permitted to obtain injunctions of secondary activity").

## NEW MEXICO LAW REGARDING TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS

38.     Under New Mexico law, tortious interference with an existing contractual relationship and tortious interference with a prospective contractual relationship are separate claims.  <u>See</u> <u>Fikes v. Furst</u>, 2003-NMSC-033,  ¶  22,  81  P.3d  545,  552; <u>Guest v. Berardinelli</u>, 2008-NMCA-144, ¶ 32, 195 P.3d 353, 363.  New Mexico courts have recognized that existing contractual relationships merit more protection than prospective contractual relationships, and thus, a different analysis is appropriate for the two claims.  <u>See</u> <u>Fikes v. Furst</u>, 2003-NMSC-033, ¶ 22, 81 P.3d at 552.  Neither New Mexico nor, to the Court's knowledge, any other jurisdiction recognizes a claim for attempted tortious interference.

**1.     <u>New Mexico Law Regarding Tortious Interference With Existing Contractual Relationships</u>.**

39.     To properly plead a claim of tortious interference with existing contractual relationships, a plaintiff must allege that: (i) the defendant had knowledge of existing contracts; (ii) the contracts were breached; (iii) the defendant played an active and substantial part in causing the plaintiff to lose the benefits of the contract; (iv) damages flowed from the breached contract; and (v) the defendant induced the breach without justification or privilege.  <u>See</u> <u>Wolf v. Perry</u>, 1959-NMSC-044, ¶¶ 19-22, 339 P.2d 679, 681-82; <u>Ettenson v. Burke</u>, 2001-NMCA-003, ¶ 14, 17 P.3d 440, 446.  A plaintiff seeking to hold a defendant liable for tortious interference with an existing contractual relationship must allege "that the contract would otherwise have been performed, and that it was breached and abandoned by reason of the defendant's wrongful act and that such act was the moving cause thereof."  <u>Wolf v. Perry</u>, 1959-NMSC-044, ¶ 22, 339 P.2d at 682.  Unless the defendant's allegedly tortious actions were "the proximate cause of the

injury there is no liability." Wolf v. Perry, 1959-NMSC-044, ¶ 22, 339 P.2d at 682 (internal quotation marks and citations omitted).

40.     A plaintiff must also allege that the defendant acted with either an improper motive or improper means, and that "the improper motive or improper means [was] used in persuading the person to breach the contract." Martin v. Franklin Capital Corp., 2008-NMCA-152, ¶ 7, 195 P.3d 24, 27 (alteration added). The plaintiff does not need to allege that the improper motive was the sole motive for the interference. See Fikes v. Furst, 2003-NMSC-033, ¶ 21, 81 P.3d at 552 ("This Court, though, has never stated that an improper motive must be the sole motive for interfering with an existing contract."). Improper means can be indicated by violence, threats or other intimidation, deceit or misrepresentation, bribery, unfounded litigation, defamation, or disparaging falsehood, but this list is not definitive. See M & M Rental Tools, Inc. v. Milchem, Inc., 1980-NMCA-072, ¶ 29, 612 P.2d 241, 246.

41.     An ongoing business relationship, specifically a relationship in which a company fills orders for repeat purchasers who are not contractually obligated to purchase again in the future, does not, without more, constitute a contractual relation. See Guidance Endodontics, LLC v. Dentsply Int'l, Inc., Memorandum Opinion and Order at 15-16, No. 08-1101 JB/RLP, filed September 11, 2009 (D.N.M.)(Browning, J.)(Doc. 316)("Guidance Memorandum Opinion and Order")("[T]he Court believes that the Supreme Court of New Mexico would hold that the alleged ongoing business relationship between [the Plaintiff] and its customers does not, without more, constitute an existing contractual relation."). New Mexico's Uniform Commercial Code permits a contract for the sale of goods to be formed "in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract." NMSA 1978, § 55-22-4(1) (1961). Section 55-2-204(1) implies that there must be some

showing of agreement. Even though one or more terms may be left open, a contract for sale will not fail for indefiniteness if "the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy." NMSA 1978, § 55-2-204(3) (1961). It is not clear, however, that the courts could provide a remedy if a party in an ongoing business relationship attempted to enforce the "business relationship." An ongoing business relationship therefore does not, without more, constitute an existing contractual relationship. See Guidance Memorandum Opinion and Order at 16.

2. **New Mexico Law Regarding Tortious Interference With Prospective Contractual Relationships.**

42. New Mexico has adopted the tort of interference with prospective contractual relations, as stated in Restatement (Second) of Torts § 766B. See M & M Rental Tools, Inc. v. Milchem, Inc., 1980-NMCA-072, ¶ 20, 612 P.2d at 245. Section 766B states:

> One who intentionally and improperly interferes with another's prospective contractual relation . . . is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of:
>
> (a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or
>
> (b) preventing the other from acquiring or continuing the prospective relation.

M & M Rental Tools, Inc. v. Milchem, Inc., 1980-NMCA-072, ¶ 20, 612 P.2d at 245; Restatement (Second) of Torts § 766B. In short, a plaintiff must allege that "there was an actual prospective contractual relation which, but for the [Defendant's] interference, would have been consummated." Anderson v. Dairyland Ins. Co., 1981-NMSC-130, ¶ 13, 637 P.2d 837, 841.

43. A plaintiff must also allege that the defendant committed the tort with either improper motive or through improper means. See Zarr v. Washington Tru Solutions,

_LLC_, 2009-NMCA-050, ¶¶ 10-11, 208 P.3d 919, 921. The Court of Appeals of New Mexico has held that, although a plaintiff must allege that the defendant's sole motive was to harm under the improper motive theory, such a showing is not necessary under an improper-means theory. See _Zarr v. Washington Tru Solutions, LLC_, 2009-NMCA-050, ¶ 11, 208 P.3d at 921-22.

44. The commentary to the Restatement (Second) of Torts § 766B describes the relationships that will support an interference with prospective contractual relations tort:

> The relations protected against intentional interference by the rule stated in this Section include any prospective contractual relations, except those leading to contracts to marry, if the potential contract would be of pecuniary value to the plaintiff. Included are interferences with the prospect of obtaining employment or employees, the opportunity of selling or buying land or chattels or services, and any other relations leading to potentially profitable contracts. Interference with the exercise by a third party of an option to renew or extend a contract with the plaintiff is also included. Also included is interference with a continuing business or other customary relationship not amounting to a formal contract. In many respects, a contract terminable at will is closely analogous to the relationship covered by this Section.
>
> The expression, prospective contractual relations, is not used in this Section in a strict, technical sense. It is not necessary that the prospective relation be expected to be reduced to a formal, binding contract. It may include prospective quasi-contractual or other restitutionary rights or even the voluntary conferring of commercial benefits in recognition of a moral obligation.

Restatement (Second) of Torts § 766B cmt. c. See also _Mountain Highlands, LLC v. Hendricks_, No. CIV 08-0239, 2009 WL 2486047, at *12-13 (D.N.M. July 30, 2009)(Browning, J.).

45. In _Los Alamos National Bank v. Martinez Surveying Services, LLC_, 2006-NMCA-081, 139 P.3d 201, overruled on other grounds by _Zarr v. Washington Tru Solutions, LLC_, 2009-NMCA-050, ¶ 11, 208 P.3d at 922, the Court of Appeals of New Mexico reversed a judgment in favor of the defendant/counter-plaintiff on its claim of interference with prospective

contractual relations because neither improper means nor improper motive were present. See Los Alamos Nat'l Bank v. Martinez Surveying Servs., LLC, 2006-NMCA-081, ¶ 1, 139 P.3d at 203. The alleged prospective contractual relationship was an "ongoing, voluntary relationship" in which a company regularly bought surveys from the defendant/counter-plaintiff. Los Alamos Nat'l Bank v. Martinez Surveying Servs., LLC, 2006-NMCA-081, ¶ 3, 139 P.3d at 203. Neither party argued that this relationship was not a prospective contractual relationship, and the Court of Appeals did not discuss the issue. This relationship appears to be typical of the situations that have arisen in New Mexico involving prospective contractual relations. See Zarr v. Washington Tru Solutions, LLC, 2009-NMCA-050, ¶¶ 17-23, 208 P.3d at 923 (discussing a claim for intentional interference with an at-will employment relationship, and stating that any claim of intentional interference with an at-will employment relationship is treated as interference with a prospective employment relationship); M & M Rental Tools, Inc. v. Milchem, Inc., 1980-NMCA-072, ¶¶ 1-11, 612 P.2d at 242-43 (stating that the plaintiff brought a suit for interference with prospective contractual relations following a situation where the plaintiff was discussing selling a pump to a company when the defendant, who was visiting the plaintiff's premises, asked to speak to the buyer and offered to sell the pump to the buyer).

46. The Court concludes that comment c and its broad definition of contractual relations applies only to prospective contractual relations and not to existing contractual relations. The broader definition of prospective contractual relationships is consistent with New Mexico case law that analyzes the two claims separately, because existing contractual relationships merit more protection than prospective contractual relationships. See Fikes v. Furst, 2003-NMSC-033, ¶¶ 21-22, 81 P.3d at 552. This broader definition of prospective contractual relationships is consistent with New Mexico law, because it is more difficult to

recover under a claim of interference with prospective contractual relations than it is to recover under a claim of interference with existing contractual relations. See Fikes v. Furst, 2003-NMSC-033, ¶ 21, 81 P.3d at 552 ("This Court . . . has never stated that an improper motive must be the sole motive for interfering with an existing contract."); Zarr v. Washington Tru Solutions, LLC, 2009-NMCA-050, ¶¶ 12-16, 208 P.3d at 921-22 (stating that, under the improper motive theory, a plaintiff must allege that the defendant's sole motive was to harm). Accordingly, while New Mexico imposes a more demanding standard to establish interference with prospective contractual relations, New Mexico will require less if there is a legally enforceable contract; the broader business relationships must meet the more stringent standards. See Horizon AG-Prod. v. Precision Sys. Eng'g, Inc., No. CIV 09-1109 JB/DJS, 2010 WL 4054131, at *5-8 (D.N.M. Sept. 28, 2010)(Browning J.).

## NEW MEXICO LAW REGARDING PRIMA-FACIE TORT

47.     In Schmitz v. Smentowski, 1990-NMSC-002, 785 P.2d 726, the Supreme Court of New Mexico recognized a cause of action for prima-facie tort. See Schmitz v. Smentowski, 1990-NMSC-002, ¶¶ 49-52, 785 P.2d at 736. The underlying theory of the prima-facie tort is that a party who intends to cause injury to another should be liable for that injury, if the conduct is generally culpable and not justifiable under the circumstances. See Schmitz v. Smentowski, 1990-NMSC-002, ¶¶ 36-38, 785 P.2d at 734.

48.     The elements of a cause of action for prima facie tort are: (i) commission of an intentional, lawful act; (ii) an intent to injure the plaintiff; (iii) injury to the plaintiff as a result of the intentional act; and (iv) the absence of sufficient justification for the injurious act. See Lexington Ins. Co. v. Rummel, 1997-NMSC-043, ¶ 10, 945 P.2d 992, 995; UJI 13-1631 NMRA (listing the elements as: (i) that the defendant intentionally did some act; (ii) that the

defendant intended that the act would cause harm to the plaintiff or that the defendant knew with certainty that the act would cause harm to the plaintiff; (iii) that the defendant's act was a cause of plaintiff's harm; and (iv) that the defendant's conduct was not justifiable under all circumstances). In <u>Schmitz v. Smentowski</u>, the Supreme Court of New Mexico emphasized the importance of limiting the cause of action for prima facie tort, because prima facie tort is not intended to provide a remedy for every intentionally caused harm. <u>See Schmitz v. Smentowski</u>, 1990-NMSC-002, ¶¶ 36-38, 785 P.2d at 734. <u>See also Lexington Ins. Co. v. Rummel</u>, 1997-NMSC-043, ¶ 11, 945 P.2d at 995 ("In recognizing prima facie tort, this Court emphasized the importance of limiting the cause of action . . . . Prima facie tort was not intended to provide a remedy for every intentionally caused harm.").

49. Because not every intentionally caused harm gives rise to an actionable tort, once a plaintiff establishes intent to injure, the trial court must balance the defendant's act or acts against the justification for the act or acts and the severity of the injury, weighing: (i) the injury, (ii) the culpable character of the conduct, and (iii) whether the conduct is unjustifiable under the circumstances. <u>See Portales Nat. Bank v. Ribble</u>, 2003-NMCA-093, ¶ 4, 75 P.3d 838, 840. These three balancing factors were refined into four factors in <u>Beavers v. Johnson Controls World Servs., Inc.</u>, 1995-NMCA-070, ¶ 21, 901 P.2d 761, 767, and in the UJIs. The UJIs instruct the jury to weigh four factors in determining whether the defendant's act was justifiable under the circumstances. <u>See</u> UJI 13-1631A NMRA. These factors are: (i) the nature and seriousness of the plaintiff's harm; (ii) the fairness or unfairness of the means that the defendant used; (iii) the defendant's motive or motives; and (iv) the value to defendant or to society in general of the interests that the defendant's conduct advances. <u>See</u> UJI 13-1631A NMRA.

50.     If the court concludes that there is sufficient evidence to support all four elements in UJI 13-1631, it must then give the jury the balancing factors in UJI 13-1631A, if the Court determines that a reasonable jury could balance the factors and find for the plaintiff.  "The trial court must initially balance these factors and, if it finds that a jury could reasonably find in the plaintiff's favor, the trial court must submit the claim to the jury for its own balancing of the factors."  Portales Nat. Bank v. Ribble, 2003-NMCA-093, ¶ 5, 75 P.3d at 840.

51.     In Martinez v. Northern Rio Arriba Electric Co-op., Inc., 2002-NMCA-083, 51 P.3d 1164, the Court of Appeals of New Mexico performed the balancing test and held that the plaintiff did not make an actionable prima facie tort claim.  See 2002-NMCA-083, ¶¶ 24-31, 51 P.3d at 1171.  The Court of Appeals concluded that the defendant's conduct had some justification, because: (i) the conduct related to furthering a legitimate business interest; (ii) the means that the defendant used were not outside the ambit of legitimate employer behavior; (iii) the evidence did not support the view that the defendant acted maliciously with the intent to cause the injury and without sufficient justification; and (iv) the emotional difficulties which the plaintiff experienced because of the defendant's actions did not, on balance, support a claim for prima-facie tort.  See 2002-NMCA-083, ¶¶ 24-31, 51 P.3d at 1170-71.  The Court of Appeals of New Mexico stated: "We are not persuaded that any of these allegations, or all of them taken together, rise to the level of both behavior and injury that is envisioned by the theory of prima facie tort."  2002-NMCA-083, ¶ 30, 51 P.3d at 1171.  See Mosley v. Titus, 762 F. Supp. 2d 1298, 1321-22 (D.N.M. 2010)(Browning, J.).

## ANALYSIS

52.     The Court first ascertains its jurisdiction over this matter, concluding that it has jurisdiction pursuant to 28 U.S.C. §§ 1331 & 1367(a).  The Court then considers whether the

Norris-LaGuardia Act's provisions, 29 U.S.C. §§ 101-115, apply to Firebird Structures' TRO application. The Court concludes that the Norris-LaGuardia Act applies, because Firebird Structures and the Carpenters' Union are involved in a "labor dispute" as the Norris-LaGuardia Act defines that term. 29 U.S.C. §§ 101 & 113(a)-(c). The Court then concludes that Firebird Structures is not entitled to injunctive relief on its LMRA § 303 claim, 29 U.S.C. § 187, because that statutory provision only awards damages.

53. Next, the Court assesses the likelihood of success of Firebird Structures' state tort claims. The Court concludes that Firebird Structures is not likely to prevail on its two claims asserting tortious interference with contractual relations, because Firebird Structures' LMRA § 303 claim, 29 U.S.C. § 187, preempts those claims. The Court also concludes that Firebird Structures is not likely to prevail on its claims for trespass, nuisance, harassment, and prima facie tort, because Firebird Structures has not satisfied its burden, which the Norris-LaGuardia Act's § 6, 29 U.S.C. § 106, requires, to establish by "clear proof" that the Carpenters' Union authorized or was otherwise involved in Firebird Structures' assertions of tortious conduct. Moreover, the Court concludes that the Norris-LaGuardia Act's § 4, 29 U.S.C. § 104, deprives the Court of jurisdiction to enjoin the Carpenters' Union from certain conduct that Firebird Structures asserts is tortious. Last, the Court concludes that, on the limited record before the Court, the four factors guiding the propriety of PI relief weighs against the Court's issuance of a TRO to Firebird Structures. Accordingly, the Court will deny Firebird Structures' Motion.

## I. THE COURT HAS JURISDICTION OVER THIS CASE UNDER 28 U.S.C. §§ 1331 & 1367(A).

54. The Court has jurisdiction over this case pursuant to 28 U.S.C. §§ 1331 & 1367(a). In its amended complaint, Firebird Structures asserts a claim for damages under 29 U.S.C. § 187. See Verified Complaint ¶¶ 17-26, at 3-4. Whether 29 U.S.C. § 187 entitles

Firebird Structures to damages based on Firebird Structures' claim that the Carpenters' Union violated NLRA § 8(b)(4), 29 U.S.C. § 158(b)(4), is a question of federal law and, therefore, establishes the Court's original jurisdiction. See 28 U.S.C. § 1331. Firebird Structures' state-law tort claims are so related to its federal claim for damages under 29 U.S.C. § 187 as to form part of the same case or controversy, because each state tort claim arises out of the same set of factual allegations regarding the Carpenters' Union alleged campaign against Firebird Structures. See Verified Complaint ¶¶ 1-17, 27, 32, 37, 42, 48, 55, 61, at 2-7. Firebird Structures' state-law tort claims seek relief based on alleged tortious activity of the Carpenters' Union in their alleged campaign against Firebird Structures, see Verified Complaint ¶¶ 27-67, at 4-7, and the tortious activity that Firebird Structures attributes to the Carpenters' Union, including tortious interference with existing and prospective contractual relations, nuisance, harassment, and prima facie tort, see Verified Complaint ¶¶ 32-60, at 4-7, forms part of the same controversy as Firebird Structures' claim that the Carpenters' Union is engaged in an unlawful secondary boycott aimed "to coerce Firebird's clients to cease doing business with Firebird," Verified Complaint ¶18, at 3. Accordingly, under 28 U.S.C. § 1367(a), the Court has supplemental jurisdiction over Firebird Structures' state tort claims. See 28 U.S.C. § 1367(a); Mocek v. City of Albuquerque, 813 F.3d 912, 935 (10th Cir. 2015)("A federal court has supplemental jurisdiction to hear any state-law claim that is 'so related to' any claims within the court's original jurisdiction as to 'form part of the same case or controversy under Article III of the United States Constitution.'")(quoting 28 U.S.C. § 1367(a)).

55. The Court notes that this case arrived in the Court by way of the Carpenters' Union's Removal Petition. See Removal Petition at 1-6. After the Carpenters' Union filed its Removal Petition, Firebird Structures filed an amended complaint, in which Firebird Structures

pled a claim under the LMRA's § 303, 29 U.S.C. § 187, as a basis for the Court's jurisdiction. See Verified Complaint ¶¶ 17-26, at 3-4. As the Court concludes supra, in light of Firebird Structures' federal claim, it has jurisdiction over this case under 28 U.S.C. §§ 1331 and supplemental jurisdiction over Firebird Structures' state-law claims under 28 U.S.C. § 1367(a). Firebird Structures' amended complaint, adding the claim under the LMRA's § 303, 29 U.S.C. § 187, cures any jurisdictional defect that the Carpenters' Union potentially improper removal may have caused and concomitantly moots the question whether removal was proper. See Retail Prop. Trust, 768 F.3d at 962.

56.     The general rule is that federal courts assess subject-matter jurisdiction when a complaint is filed, or at the time of removal to federal court when a case is originally filed in state court. See, e.g., Pullman Co. v. Jenkins, 305 U.S. 534, 537 (1939). See also 14C Wright, Miller & Cooper, Federal Practice and Procedure § 3739, at 468 (3d ed. 1998)("[W]hether an action should be remanded to state court must be resolved by the district court with reference to the complaint, the notice of removal, and the state court record at the time the notice of removal was filed."). This rule admits of a number of exceptions, however. See, e.g., In re Methyl Tertiary Butyl Ether ("MTBE") Prod. Liab. Litig., 510 F. Supp. 2d 299, 306-07 (S.D.N.Y. 2007)(Scheindlin, J.). First, 28 U.S.C. § 1653 states that "[d]efective allegations of jurisdiction may be amended, upon terms, in the trial or appellate courts." 28 U.S.C. § 1653 . Second, rule 21 of the Federal Rules of Civil Procedure permits a court, on motion or sua sponte, to order that a party be "dropped or added . . . at any stage of the action and on such terms as are just," and such an order under rule 21 might affect the court's subject-matter jurisdiction on diversity grounds. Fed. R. Civ. P. 21. Third, and relevant here, a district court may properly exercise jurisdiction based on a jurisdiction-curing event that occurred after filing, but before the entry of

final judgment.  See Caterpillar Inc. v. Lewis, 519 U.S. 61, 73 (1996)(holding that a jurisdictional defect that complete diversity existed, which existed when case was removed on erroneous grounds, was cured before trial commenced when remaining nondiverse defendant settled subrogation claim against it and was dismissed as defendant); Grubbs v. Gen. Elec. Credit Corp., 405 U.S. 699, 700 (1972)("We have concluded that, whether or not the case was properly removed, the District Court did have jurisdiction of the parties at the time it entered judgment.").

57.    For example, after a defendant improperly removes a complaint from state court -- entailing the absence of federal jurisdiction at the time of removal -- a plaintiff may amend his complaint to assert a federal claim, thereby "cur[ing] the jurisdictional defect" and waiving any future objection to the federal court's denial of remand.  Gentek Bldg. Prod., Inc. v. Sherwin-Williams Co., 491 F.3d 320, 325 (6th Cir. 2007).  No fewer than seven United States Courts of Appeals, including the Tenth Circuit, have held that an amended complaint -- filed after an improper removal or a potentially improper removal -- that adds a claim arising under federal law is sufficient to confer subject matter jurisdiction on the district court.  See, e.g., Retail Prop. Trust, 768 F.3d at 962 ("The question of whether removal of this matter from state court to federal court was proper is moot, as the [Plaintiff] waived any claim to remand to state court once it pled § 303 and 28 U.S.C. § 1331 as a basis for jurisdiction in the [Second Amended Complaint]."); Gentek Bldg. Prod., Inc. v. Sherwin-Williams Co., 491 F.3d at 325; In re Wireless Tel. Fed. Cost Recovery Fees Litig., 396 F.3d 922, 929 (8th Cir. 2005)(holding that "the amended complaint properly conferred jurisdiction on the district court" even though the plaintiffs had challenged the propriety of removal from state court); Albert v. Smith's Food & Drug Centers, Inc., 356 F.3d 1242, 1246-47 (10th Cir. 2004)(holding that, even if removal were improper, "a remand to a state court would be improper because the district

court thereafter had federal question jurisdiction by virtue of the ADA claim" that the plaintiff added in her "third amended complaint"); Chabner v. United of Omaha Life Ins. Co., 225 F.3d 1042, 1046 n.3 (9th Cir. 2000)("In this case, . . . the amended complaint solidified rather than destroyed federal jurisdiction . . . because the [newly added] ADA claim raised a federal question, subject matter jurisdiction existed at the time the district court entered judgment. Therefore, this case was properly in federal court.")(alterations added)(citations omitted); Tolton v. Am. Biodyne, Inc., 48 F.3d 937, 941 (6th Cir. 1995)("We also note that after removal, plaintiffs amended their complaint to include an ERISA cause of action. Amending a complaint after removal cures a jurisdictional defect.")(citation omitted); Kidd v. Sw. Airlines, Co., 891 F.2d 540, 547 (5th Cir. 1990)(concluding that where a plaintiff challenged the propriety of removal and then "voluntarily amends the original complaint to allege a federal cause of action . . . the district court . . . acquired jurisdiction by virtue of [the plaintiff's] amended [federal] ERISA claim"); Bernstein v. Lind-Waldock & Co., 738 F.2d 179, 185 (7th Cir. 1984)(Posner J.)(holding that plaintiff's claim "was not removable to federal court . . . ," but after the defendant's motion to remand was improperly denied, the plaintiff "filed an amended complaint in federal court that included an unmistakable federal cause of action . . . [that] was thus within the original jurisdiction of the federal district courts and it makes no difference that it was filed only because [the plaintiff's] previous suit had improperly been removed"); Brough v. United Steelworkers of Am., AFL-CIO, 437 F.2d 748, 750 (1st Cir. 1971)(holding that, although federal jurisdiction did not exist at the time of removal -- making the removal improper -- the plaintiff's "amendment [of a federal claim to the plaintiff's complaint] had the effect of curing the defect in the district court's jurisdiction").  Secondary authority also supports the rule.  See 14C Federal Practice & Procedure § 3738, at 706-707 (4th ed.)("Once a case has been removed,

the parties may amend the pleadings filed in the state court . . . asserting a cause of action over which the state court would not have had jurisdiction but which is within the subject-matter jurisdiction of the federal court . . . .").  The Court has, in its extensive search, not found a case to the contrary.

58.    The rule that an amended complaint -- filed after an improper removal and adding a claim arising under federal law -- is sufficient to confer subject matter jurisdiction on the district court is sound, because it aligns with the law of civil procedure regarding an amended complaint's relation back.  It is well-established that "an amended complaint 'supersedes an original complaint and renders the original complaint without legal effect . . . .'"  Mink v. Suthers, 482 F.3d 1244, 1254 (10th Cir. 2007)(quoting In re Atlas Van Lines, Inc., 209 F.3d 1064, 1067 (8th Cir. 2000)).  Rule 15(c)(1)(B) of the Federal Rules of Civil Procedure allows an amended complaint to relate back when the claim in the amended pleading "arose out of the conduct, transaction, or occurrence set out -- or attempted to be set out -- in the original pleading . . . ."  Fed. R. Civ. P. 15(c)(1)(B).  Accordingly, "where a plaintiff has filed an amended complaint, federal courts must resolve questions of subject matter jurisdiction by examining the face of the amended complaint."  In re Wireless Tel. Fed. Cost Recovery Fees Litig., 396 F.3d 922, 928-29 (8th Cir. 2005)(citing In re Atlas Van Lines, Inc., 209 F.3d at 1067).  See Sunkyong Int'l, Inc. v. Anderson Land & Livestock Co., 828 F.2d 1245, 1252 (8th Cir. 1987)(recognizing that an amended complaint can cure a defect in subject-matter jurisdiction); Carney v. Resolution Trust Corp., 19 F.3d 950, 954 (5th Cir. 1994)(holding that relation back is appropriate "even when the amendment states a new basis for subject matter jurisdiction"); Berkshire Fashions, Inc. v. M.V. Hakusan II, 954 F.2d 874, 887 (3rd Cir. 1992)("Relation back to the date of the original filing applies even when the amendment

states a new basis for subject matter jurisdiction."); Abraham v. WPX Prod. Prods., LLC, 184 F. Supp. 3d 1150, 1177-78 (D.N.M. 2016)(Browning, J.)("'Because the addition of these new lead Plaintiffs in the Amended Complaint relates back to the filing of the Original Complaint, subject-matter jurisdiction has been continuous in this suit from its institution to the present time.'")(quoting Genesee Cty. Emps' Ret. Sys. v. Thornburg Mortg. Sec. Trust 2006-3, 825 F. Supp. 2d 1082, 1156 (D.N.M. 2011)(Browning, J.)).

59. Accordingly, Firebird Structures' amended complaint, which added a claim under the LMRA's § 303, 29 U.S.C. § 187, establishes the Court's jurisdiction over this case and cures any jurisdictional defect that the Carpenters' Union's potentially improper removal may have caused. See Retail Prop. Trust, 768 F.3d at 962. Furthermore, the question whether, by their Removal Petition, the Carpenters' Union properly removed the case to federal court is moot, because Firebird Structures waived any claim to remand in the state court once it pled its claim under the LMRA's § 303, 29 U.S.C. § 187. See Retail Prop. Trust, 768 F.3d at 962 ("The question of whether removal of this matter from state court to federal court was proper is moot, as the [plaintiff] waived any claim to remand to state court once it pled § 303 and 28 U.S.C. § 1331 as a basis for jurisdiction in the [Second Amended Complaint].").

## II. THE NORRIS-LAGUARDIA ACT APPLIES TO FIREBIRD STRUCTURES' APPLICATION FOR A TRO.

60. Traditionally, a party may obtain a TRO or a PI under rule 65(b) by demonstrating "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Winter, 555 U.S. at 20 (citing Munaf v. Geren, 553 U.S. at 689-90). In cases "involving or growing out of any labor dispute," however, the Norris-LaGuardia Act constrains the federal courts' jurisdiction to issue injunctive relief. 29 U.S.C. §§

101 & 104.  The Norris-LaGuardia Act is "an anti-injunction statute," <u>San Antonio Cmty. Hosp.</u>

<u>v. S. California Dist. Council of Carpenters</u>, 125 F.3d at 1234, and the statute prevents district

courts from issuing "any restraining order or temporary or permanent injunction in a case

involving or growing out of a labor dispute, except in a strict conformity with [its] provisions,"

29 U.S.C. § 101 (alteration added).  The Norris-LaGuardia Act denies jurisdiction to federal

districts courts to issue injunctive relief that would prohibit unions and union members from <u>inter</u>

<u>alia</u>:

> (c) Paying or giving to, or withholding from, any person participating or interested in such labor dispute, any strike or unemployment benefits or insurance, or other moneys or things of value;
>
> . . .
>
> (d) Giving publicity to the existence of, or the facts involved in, any labor dispute, whether by advertising, speaking, patrolling, or by any other method <u>not involving fraud or violence</u>;
>
> (e) Assembling peaceably to act or to organize to act in promotion of their interests in a labor dispute;
>
> (f) Advising or notifying any person of an intention to do any of the acts heretofore specified;
>
> (g) Agreeing with other persons to do or not to do any of the acts heretofore specified; and
>
> (h) Advising, urging, or otherwise causing or inducing <u>without fraud or violence</u> the acts heretofore specified, regardless of any such undertaking or promise as is described in section 103 of this title.

29 U.S.C. § 104 (alterations added)(emphasis added).

      61.     The Norris-LaGuardia Act applies to Firebird Structures' application for a TRO in

this case, because Firebird Structures' suit against the Carpenters' Union involves or grows out

of a labor dispute.  <u>See</u> 29 U.S.C. § 113(a)-(c)(explaining when a case "shall be held to involve

or grow out of a labor dispute").  Firebird Structures alleges that the Carpenters' Union is

engaged in an unlawful secondary boycott against Firebird Structures' clients, and Firebird Structures seeks relief from this alleged unlawful secondary boycott as well as from related torts that Firebird Structures alleges the Carpenters' Union has commissioned.  See Verified Complaint ¶¶ 17-67, at 3-7.  In turn, the Southwest Regional Council of Carpenters -- of which the Carpenters' Union is a local member -- filed the NLRB Charge Against Employer, alleging that Firebird Structures discharged twenty-eight employees on or about February 10, 2017, "because they supported and assisted the Union and engaged in protected concerted activities . . . ."  NLRB Charge Against Employer at 2.  Accordingly, this case involves or grows out of a labor dispute.  See 29 U.S.C. §§ 101, 113(a)-(c).  See also San Antonio Cmty. Hosp. v. S. California Dist. Council of Carpenters, 125 F.3d at 1234 (applying the Norris-LaGuardia Act's requirement for injunctive relief where a hospital, the target of a secondary boycott, sought injunctive relief from the bannering activity of a union).

62.     Firebird Structures' argument that the Norris-LaGuardia Act does not apply, because Firebird Structures alleges state tort claims, does not convince the Court.  See Tr. at 152:18-22 (Thomas)(arguing that the "Norris-LaGuardia does not apply to state court tort actions[:] trespass, nuisance, [and] harassment"); id. at 143:15-16 (Thomas)(arguing that the Court should review its claims not under any federal act, but rather under New Mexico law and "the standard for issuing an injunction that the Court is well aware of").  Gibbs, 383 U.S. at 737, forecloses Firebird Structures' argument.  There, the Supreme Court held that the Norris-LaGuardia Act's § 6 "applies to federal court adjudications of state tort claims arising out of labor disputes, whether or not they are associated with claims under the LMRA's § 303 to which the section does not apply."  Gibbs, 383 U.S. at 737.  Furthermore, Retail Property Trust v. United Bhd. of Carpenters and Joiners of Am., on which Firebird Structures relies, is unavailing.

In that opinion, the Ninth Circuit held that the LMRA's § 303 did not preempt the plaintiff's trespass or nuisance claims, because those claims were predicated on allegations of violence and imminent threats. See Retail Prop. Trust, 768 F.3d at 961 (holding that "federal preemption does not bar the plaintiff's claims from going forward, because the conduct at issue is, at most, 'a merely peripheral concern' of federal labor law")(quoting Lodge 76, Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. Wisconsin Employment Relations Comm'n, 427 U.S. 132, 137 (1976)). Whether the LMRA's § 303 preempts state-law tort claims and whether the Norris-LaGuardia Act applies are distinct questions, see Gibbs, 383 U.S. at 737, and Firebird Structures' emphasis that "[t]here is damage to property" and "consistent harassment" of Firebird Structures' employees and principals, Tr. at 143:22-144:1 (Thomas), is more directed to whether the LMRA's § 303 preempts their state tort claims grounded on those allegations than whether the Norris-LaGuardia Act's anti-injunction requirements apply. The Ninth Circuit in Retail Property Trust v. United Bhd. of Carpenters and Joiners of Am. did not consider whether the Norris-LaGuardia Act applied, see 768 F3d. at 946-62; moreover, in Gibbs, the Supreme Court made it plain that the Norris-LaGuardia Act applies to state tort claims arising out of labor disputes, irrespective of their interaction with the LMRA's § 303, see Gibbs, 383 U.S. at 737. Accordingly, the Court declines to adopt Firebird Structures' argument that the Norris-LaGuardia Act does not apply to their TRO application.

63.     The Norris-LaGuardia Act applies to this case and consequently imposes a significant burden on Firebird Structures. In addition to satisfying the traditional requirements for a TRO, see, e.g., Winter, 555 U.S. at 20, Firebird Structures, as the TRO applicant, must prove the following additional elements: (i) that the Carpenters' Union threatens unlawful acts and will commit those acts unless restrained, see 29 U.S.C. § 107(a); (ii) that substantial and

irreparable injury to Firebird Structure's property will follow, see 29 U.S.C. § 107(b); (iii) that

greater injury will be inflicted upon Firebird Structures by the denial of relief than will be

inflicted upon the Carpenters' Union by the granting of relief, see 29 U.S.C. § 107(c); (iv) that

the Carpenters' Union has no adequate remedy at law, 29 U.S.C. § 107(d); (v) that the public

officers charged with the duty to protect Firebird Structures' property are unable or unwilling to

furnish adequate protection, see 29 U.S.C. § 107(e); and (vi) that Firebird Structures has made

every reasonable effort to settle the dispute, see 29 U.S.C. § 108.  See also San Antonio Cmty.

Hosp. v. S. California Dist. Council of Carpenters, 125 F.3d at 1234 (holding that the proponent

of a PI sought against a union had the burden to prove these requirements).

64.     Moreover, "Section 6 of the Norris-LaGuardia Act, 29 U.S.C. § 106, applies in

federal court adjudications of state tort claims arising out of labor disputes."  Fry, 88 F.3d at 841-

42 (citing Gibbs, 383 U.S. at 737).  That statutory provision provides:

> No officer or member of any association or organization, and no association or
> organization participating or interested in a labor dispute, shall be held
> responsible or liable in any court of the United States for the unlawful acts of
> individual officers, members, or agents, except upon clear proof of actual
> participation in, or actual authorization of, such acts, or of ratification of such
> acts after actual knowledge thereof.

29 U.S.C. § 106.  See The Developing Labor Law § 1.III.D, at 23 (explaining that the Norris-

LaGuardia Acts also limits the imposition of vicarious liability on a union, union officials, or

union members for the unlawful acts of individual officers, members, or others).

65.     Under § 6, "[c]lear proof means proof which is clear, unequivocal, and

convincing."  Fry, 88 F.3d at 841 (citing Ramsey, 401 U.S. at 311; Gibbs, 383 U.S. at 737).

"Such proof, together with the statutory requirements of *actual* participation in, or *actual*

authorization of unlawful acts, or of ratification of such acts after *actual* knowledge thereof . . .

establish a congressionally mandated restrictive test of union responsibility for unlawful acts."

_Fry_, 88 F.3d at 841-42 (emphasis original)(citing 29 U.S.C. § 106; Carbon Fuel Co. v. United Mine Workers, 444 U.S. at 217 n.6). "A preponderance of the evidence is insufficient to survive a motion for summary judgment by the union under the clear proof standard." _Fry_, 88 F.3d at 842 (citing Gibbs, 383 U.S. at 737, 739; Anderson v. Liberty Lobby, Inc., 477 U.S. at 254). See Fleming, 532 F.2d at 164 (concluding that "[t]he preponderance of the evidence standard is applicable in civil actions against labor unions with the exception of those situations triggering the application of § 6 of the Norris-LaGuardia Act which requires the 'clear proof' standard"). See also Gibbs, 383 U.S. at 737 ("Plainly, § 6 applies to federal court adjudications of state tort claims arising out of labor disputes, whether or not they are associated with claims under § 303 to which the section does not apply."). Therefore, to obtain the TRO it seeks, Firebird Structures has the burden to demonstrate "upon clear proof" that the Carpenters' Union is responsible for the tortious acts that Firebird Structures asserts. 29 U.S.C. § 106. See Verified Complaint ¶¶ 27-60 at 4-7.

## III. FIREBIRD STRUCTURES IS NOT ENTITLED TO INJUNCTIVE RELIEF ON ITS 29 U.S.C. § 187 CLAIM.

66.     Although the Norris-LaGuardia Act's application imposes a burden on Firebird Structures, the Court may not issue injunctive relief on three of Firebird Structures' claims -- namely, Firebird Structures' LMRA § 303 claim and its tortious interference claims -- for statutory and preemption reasons, respectively, which are wholly unrelated to the Norris-LaGuardia Act's application to this case.

67.     In its Verified Complaint, Firebird Structures asserts a claim under the LMRA's § 303, 29 U.S.C. § 187. See Verified Complaint ¶¶ 17-26, at 3-4. Firebird Structures alleges that the Carpenters' Union "has engaged in a campaign to pressure or coerce Firebird's clients to cease doing business with Firebird," by sending letters stating that the Carpenters' Union "will

protest and picket any site where Firebird does business." Verified Complaint ¶¶ 18, 22 at 3. Firebird Structures states that this alleged activity constitutes an unlawful secondary boycott, contrary to § 8(b)(4) of the NLRA, 29 U.S.C. § 158(b)(4), see Verified Complaint ¶¶ 24-25, at 3-4, and, consequently, they assert a claim under 29 U.S.C. § 187.

68.    The Court lacks jurisdiction to issue an injunction against the Carpenters' Union for violations of the NLRA's § 8(b)(4); only the NLRB has that power. See Burlington N. R. Co. v. Bhd. of Maint. of Way Emps., 481 U.S. 429, 448 (1987)("[T]he NLRA does not permit employers to seek injunctions against the activity that it does prohibit. It grants to the National Labor Relations Board (NLRB) exclusive authority to seek injunctions against some forms of secondary activity.")(citing 29 U.S.C. §§ 158(b)(4), 160(j) & 160(l)); Amalgamated Ass'n of St., Elec. Ry. & Motor Coach Emp. of Am. v. Dixie Motor Coach Corp., 170 F.2d 902, 907 (8th Cir. 1948)(concluding that "the federal district courts are not vested with jurisdiction in cases involving or growing out of labor disputes to enjoin at the instance of private parties acts or conduct which may be alleged"). Furthermore, 29 U.S.C. § 187 does not confer jurisdiction on the Court to issue injunctive relief for alleged violations of the NLRA's § 8(b)(4); the statute confers jurisdiction on the Court to award damages only. See 29 U.S.C. § 187; San Antonio Cmty. Hosp. v. S. California Dist. Council of Carpenters, 125 F.3d at 1235 ("[A]n employer cannot seek injunctive relief from a secondary boycott under section 303; only damages are available."); California Ass'n of Employers v. Building and Constr. Trades Council of Reno, 178 F.2d at 178 ("The [LMRA] did not give private litigants the right to obtain injunctive relief even in those situations where a suit for damages was allowed.").

## IV. FIREBIRD STRUCTURES IS NOT ENTITLED TO INJUNCTIVE RELIEF ON ITS CLAIMS FOR TORTIOUS INTERFERENCE WITH EXISTING CONTRACTUAL RELATIONS AND INTENTIONAL INTERFERENCE WITH PROSPECTIVE CONTRACTUAL RELATIONS.

69. In addition to satisfying the Norris-LaGuardia Act's requirements regarding the issuance of an injunction in a labor dispute, Firebird Structures must demonstrate a strong likelihood of success on the merits of one of its substantive claims. In addition to its claim under the LMRA's § 303, 29 U.S.C. § 187, Firebird Structures asserts state tort claims for trespass, nuisance, harassment, prima facie tort, tortious interference with existing contractual relations, and intentional interference with prospective contractual relations. Firebird Structures cannot demonstrate a chance of success on its two tortious interference claims, because the LMRA's § 303 preempts those claims. Accordingly, Firebird Structures is not entitled to injunctive relief on its claims for tortious interference with existing contractual relations and intentional interference with prospective contractual relations.

70. The LMRA's § 303, 29 U.S.C. § 187, confers a right of action to recover damages on any person who is injured in business or property by secondary activity prohibited under the NLRA's § 8(b)(4), 29 U.S.C. § 158(b)(4). In <u>Local 20, Teamsters, Chauffeurs and Helpers Union v. Morton</u>, 377 U.S. 252 (1964)("<u>Morton</u>"), the Supreme Court held that Congress, by enacting the NLRA's § 8(b)(4), which enumerates certain unlawful secondary union activity, in conjunction with the LMRA's § 303, "defined the category of prohibited secondary activity and provide a system of remedies." <u>The Developing Labor Law</u> § 28.V.A, at 2544. <u>See</u> <u>Morton</u>, 377 U.S. at 258 ("The type of conduct to be made the subject of a private damages action was considered by Congress, and § 303(a) comprehensively and with great particularity 'describes and condemns specific union conduct directed to specific objectives.'")(quoting <u>Local 1976, United Bhd. of Carpenters v. NLRB</u>, 357 U.S. 93, 98 (1958)). <u>Morton</u> explains:

> In selecting which forms of economic pressure should be prohibited by [section] 303, Congress struck the "balance . . . between the uncontrolled power of management and labor to further their respective interests," by "preserving the right of labor organizations to bring pressure to bear on offending employers in primary labor disputes and [by] shielding unoffending employers and others from pressures in controversies not their own."

Morton, 377 U.S. at 258-59 (alterations original)(citations omitted).  In Morton, the Supreme Court reversed a district court's holding that the union was liable under Ohio common law for compensatory and punitive damages.  See 377 U.S. at 260.  The district court had reasoned that the union secondary activity at issue, although permissible under federal law, violated Ohio common law.  See 377 U.S. at 255.  The Supreme Court explained, however:

> If the Ohio law of secondary boycott can be applied to proscribe the same type of conduct which Congress focused upon but did not proscribe when it enacted § 303, the inevitable result would be to frustrate the congressional determination to leave this weapon of self-help available, and to upset the balance of power between labor and management expressed in our national labor policy.  "For a state to impinge on the area of labor combat designed to be free is quite as much an obstruction of federal policy as if the state were to declare picketing free for purposes or by methods which the federal Act prohibits."

Morton, 377 U.S. at 259-60 (quoting Garner v. Teamsters, etc., Union, 346 U.S. 485, 500 (1953).  Accordingly, the Supreme Court reversed the district court's award of common-law liability and punitive damages against the union.  See Morton, 377 U.S. at 260.

71.     In Morton, the Supreme Court held that "the provisions of [the LMRA] § 303 mark the limits beyond which a court, state or federal, may not go in awarding damages for a union's secondary activities . . . ."  377 U.S. at 257.  The Supreme Court explained, however, that if a claim arising under state law involves union violence, then LMRA § 303 would not preempt the state claim.  See Morton, 377 U.S. at 257.  The Supreme Court quoted at length its prior analysis in San Diego Bldg. Trades Council, Millmen's Union, Local 2020 v. Garmon, 359 U.S. 236, 247-48 (1959)("Garmon"):

"[W]e have allowed the States to grant compensation for the consequences, as defined by the traditional law of torts, of conduct marked by violence and imminent threats to the public order. . . . State jurisdiction has prevailed in these situations because the compelling state interest, in the scheme of our federalism, in the maintenance of domestic peace is not overridden in the absence of clearly expressed congressional direction. . . . In the present case there is no such compelling state interest."

Morton, 377 U.S. at 257 (alterations added)(quoting Garmon, 359 U.S. at 247-48)(citations omitted). See Gibbs, 383 U.S. at 721 (holding that because violence was involved, the state claim was not preempted).

72.     Under Gibbs, Morton, and Garmon, the LMRA's § 303 preempts a state tort claim predicated on a union's secondary activity, so long as that claim is not grounded upon allegations of violence and imminent threats. See Gibbs, 383 U.S. at 721; Morton, 377 U.S. at 257-260; Garmon, 359 U.S. at 247-48. As a result, the LMRA's § 303 "generally preempts state-law claims based on conduct violative of Section 8(b)(4) [of the NLRA], such as tortious interference with prospective economic advantage and tortious interference with contract rights." The Developing Labor Law § 28.V.A, at 2544-45. See, e.g., San Antonio Cmty. Hosp. v. S. California Dist. Council of Carpenters, 125 F.3d at 1235 ("The interference with prospective economic advantage and contractual rights claims are preempted by section 303 of the LMRA.")(citing Morton, 377 U.S. at 1258-59); BE & K Constr. Co. v. United Bhd. of Carpenters & Joiners of Am., 90 F.3d 1318, 1327-30 (8th Cir. 1996)(holding that, because there was insufficient evidence of union violence, § 303 preempts a claim under Arkansas law for tortious interference with contractual relations); Iodice v. Calabrese, 512 F.2d 383, 390 (2nd Cir. 1975)(holding that § 303 preempts a claim under New York law for tortious interference with contractual relations which did not involve violence); Hennepin Broad. Assocs., Inc. v. NLRB, 408 F. Supp. 932, 938 (D. Minn. 1975)(Lord, J.)(holding that § 303 preempts Minnesota

claims for tortious interference with business relations and contracts).  See also Retail Prop. Trust, 768 F.3d at 959 (noting that "a number of courts have found preemption of state causes of action addressing economic harms")(citations omitted).

73.      Firebird Structures asserts two tortious interference claims against the Carpenters' Union -- a claim for tortious interference with existing contractual relations and a claim for intentional interference with prospective contractual rights.  See Verified Complaint ¶¶ 42-54, at 5-6.  When asserting these two claims, Firebird Structures alleges that the Carpenters' Union (i) encouraged at least two of Firebird Structures' clients "to terminate their relationships with Firebird for their own economic benefit or in an effort to harm Firebird's economic position," Verified Complaint ¶ 44, at 5; (ii) "directly corresponded with Firebird's clients, and encouraged them not to engage in future business relationships with Firebird," Verified Complaint ¶ 49, at 6; and thereby (iii) "caused several clients not to enter into business relationships with Firebird and/or prevented them from continuing the prospective relationships," Verified Complaint ¶ 52, at 6.

74.      Firebird Structures' tortious interference claims are predicated on allegations that agents of the Carpenters' Union "began circulating flyers that included false information regarding relations between Firebird's management and employees," Verified Complaint ¶ 10, at 2, and that the Carpenters' Union "began sending letters to Firebird's current and future business relations with the improper purpose of encouraging and coercing those businesses to cease current and future contracts with Firebird," Verified Complaint ¶ 14, at 3.  These allegations do not include references to violent acts or threats.  See Verified Complaint ¶¶ 10, 14 at 2, 3.

75.      Firebird Structures' Verified Complaint contains certain allegations of property damage.  See Verified Complaint ¶ 9, at 2.  Firebird Structures offered testimony that screws

were found behind the tires of Firebird Structures' vehicles and the vehicles of Firebird Structures' employees at a "separate parking area where the employees parked to go to the job site." Tr. at 61:24-25 (Cannedy). See Tr. at 92:14-20 (Romero). Firebird Structures also offered testimony that, on February 22, 2017, a vehicle of a Firebird Structures' employee, which was parked near the main office while the employee was out of town, had its back windshield "bashed in." Tr. at 27:25-28:3 (Cannedy). See Tr. at 69:9 (Erb). These allegations of property damage, however, are not proofs of Firebird Structures' tortious interference claims. Even if the allegations of property damage to Firebird Structures' vehicles and the vehicles of Firebird Structures' employees supported Firebird Structures' claims for tortious interference with contractual relations, the Court has reservations that these allegations of property damage would amount to acts or threats of violence that would sustain the Court's jurisdiction over the tortious interference claims and consequently prevent LMRA § 303 from preempting those same claims. In Gibbs, the Supreme Court explained that states have the jurisdiction to award compensation for torts "marked by violence and imminent threats to the public order . . . because the compelling state interest, in the scheme of our federalism, in the maintenance of domestic peace is not overridden in the absence of clearly expressed congressional direction." Gibbs, 383 U.S. at 721 (quoting Garmon, 359 U.S. at 247). There, the Supreme Court held that the LMRA's § 303 did not preempt a Tennessee interference-with-contract claim, because "respondent's claim is based . . . on proofs of violence and intimidation," including allegations that "armed members of the [the union] forcibly prevented the opening of [a] mine, threatening respondent and beating an organizer for the rival union." Gibbs, 383 U.S. at 718, 721 (alterations added). Even if the allegations of property damage to Firebird Structures' vehicles and the vehicles of Firebird Structures' employees supported Firebird Structures' claims for tortious interference with

contractual relations, those allegations are quite distinguishable from the record facts of violence

that the Supreme Court concluded were sufficient to defeat preemption.  See Gibbs, 383 U.S. at

718.  Nevertheless, Firebird Structure's tortious interference claims -- as opposed to its other tort

claims -- are principally based secondary activity from which either violent acts or threats are

absent.  See Verified Complaint ¶¶ 42-54, at 5-6.[12]   The LMRA's § 303 preempts those claims

against the Carpenters' Union, and, accordingly, Firebird Structures is not entitled to a TRO

based on them.[13]

## V.   FIREBIRD STRUCTURES IS NOT ENTITLED TO INJUNCTIVE RELIEF ON ITS CLAIMS FOR TRESPASS, NUISANCE, HARASSMENT, OR PRIMA FACIE TORT.

76.      Firebird Structures is not entitled to injunctive relief on its claims against the

Carpenters' Union for trespass, nuisance, harassment, or prima facie tort.  Unlike Firebird

Structures' tortious interference claims, these claims are not predicated on allegations concerning

---

[12]Firebird Structures, in asserting claims for nuisance and harassment against the Carpenters' Union, also alleges (i) that the Carpenters' Union "interfered with Firebird's and its clients' and customers' normal business operations," Verified Complaint ¶ 33, at 4; and (ii) "pursued a pattern of conduct intended to annoy, seriously alarm or terrorize Firebird's . . . clients/customers without a lawful purpose," Verified Complaint ¶ 38, at 5. Firebird Structures has not bottomed these claims on any concrete allegations of violence or threats of violence on the part of the Carpenters' Union.  Therefore, to the extent that Firebird Structures' nuisance and harassment tort claims are predicated on the Carpenters' Union secondary activity, the LMRA's § 303 also preempts those state tort claims.  See Gibbs, 383 U.S. at 721; Morton, 377 U.S. at 257-260; Garmon, 359 U.S. at 247-48.

[13]This result holds notwithstanding the Court's exercise of supplemental jurisdiction over Firebird Structures' state-law tortious interference claims.

> Pendent jurisdiction permits a federal court under some circumstances to determine a state cause of action which otherwise would have to be heard in the state court.  But if the state court would be without authority to award damages under state law, then the doctrine of pendent jurisdiction can give "the District Court . . . no greater power to do so."

Morton, 377 U.S. at 257 (alteration original)(quoting Lauf v. E. G. Shinner & Co., 303 U.S. at 328).

the secondary activity of the Carpenters' Union.  <u>See</u> Verified Complaint ¶¶ 27-41, 55-60, at 4-7.

Consequently, the LMRA's § 303 does not preempt them.  <u>See</u> <u>Morton</u>, 377 U.S. at 257-60.

Firebird Structures is unlikely to succeed on their merits for two separate, non-preemption-based

reasons: (i) the Norris-LaGuardia Act prohibits a federal court from enjoining certain conduct on

which Firebird Structures predicates its trespass, nuisance, harassment, and prima facie tort

claims, <u>see</u> 29 U.S.C. § 104(e)-(f); and (ii), on this limited record, Firebird Structures has not

established "clear proof" that the Carpenters' Union participated in or authorized the tortious

conduct which Firebird Structures alleges, <u>see</u> 29 U.S.C. § 106.

77.     The Norris-LaGuardia Act applies to Firebird Structures' application for a

temporary restraining order in this case, because Firebird Structures' state tort claims against the

Carpenters' Union involves or grows out of a labor dispute.  <u>See</u> 29 U.S.C. §§ 101, 113(a)-(c).

Under the Norris-LaGuardia Act's § 6, a union shall not "be held responsible or liable . . . for the

unlawful acts of individual officers, members, or agents, except upon clear proof of actual

participation in, or actual authorization of, such acts, or of ratification of such acts after actual

knowledge thereof."  29 U.S.C. § 106.  This section "applies in federal court adjudications of

state tort claims arising out of labor disputes."  <u>Fry</u>, 88 F.3d at 841-42 (citing <u>Gibbs</u>, 383 U.S. at

737).  <u>See</u> <u>Gibbs</u>, 383 U.S. at 737 ("Plainly, § 6 applies to federal court adjudications of state tort

claims arising out of labor disputes, whether or not they are associated with claims under § 303

to which the section does not apply.").  Under § 6, "[c]lear proof means proof which is clear,

unequivocal, and convincing."  <u>Fry</u>, 88 F.3d at 841 (citing <u>Ramsey</u>, 401 U.S. at 311; <u>Gibbs</u>, 383

U.S. at 737).  "Such proof, together with the statutory requirements of *actual* participation in, or

*actual* authorization of unlawful acts, or of ratification of such acts after *actual* knowledge

thereof . . . establish a congressionally mandated restrictive test of union responsibility for

unlawful acts." Fry, 88 F.3d at 841-42 (emphasis original)(citing 29 U.S.C. § 106; Carbon Fuel Co. v. United Mine Workers, 444 U.S. at 217 n.6). "A preponderance of the evidence is insufficient to survive a motion for summary judgment by the union under the clear proof standard." Fry, 88 F.3d at 842 (citing Gibbs, 383 U.S. at 737, 739; Anderson, 477 U.S. at 254). See Fleming, 532 F.2d at 164 (concluding that "[t]he preponderance of the evidence standard is applicable in civil actions against labor unions with the exception of those situations triggering the application of § 6 of the Norris-LaGuardia Act which requires the 'clear proof' standard"). Accordingly, to prevail on its trespass, nuisance, harassment, and prima facie tort claims, under the Norris-LaGuardia Act's § 6, Firebird Structures has the burden to establish "clear proof" of the Carpenters' Union's "actual participation in, or actual authorization of" those torts. 29 U.S.C. § 106. On this record, Firebird Structures cannot satisfy its burden to establish clear proof of the Carpenters' Union's liability on Firebird Structures' claims for trespass, nuisance, harassment, or prima facie tort.

78.     New Mexico recognizes "an action of trespass to real property . . . for the alleged injury to the right of possession." McNeill v. Rice Eng'g & Operating, Inc., 2010-NMSC-015, ¶ 1, 229 P.3d 489, 492. See North v. Pub. Serv. Co. of New Mexico, 1980-NMCA-031, ¶ 4, 608 P.2d 1128, 1129 ("Every unauthorized entry upon the land of another is a trespass which entitles the owner to a verdict for some damages."). With respect to the trespass claim, Firebird Structures alleges that Carpenters' Union representatives entered Firebird Structures' property without permission at their principal place of business. See Verified Complaint ¶ 28, at 4. At the hearing, Firebird Structures adduced testimony that Carpenters' Union representatives entered Firebird Structures' main office, seeking to speak with Cannedy. See Tr. at 27:18-23 (Cannedy). Firebird Structures also proffered testimony that, after representatives of the

Carpenters' Union left Firebird Structures' main office, screws were found behind the tires of Firebird Structures' vehicles and the vehicles of Firebird Structures' employees at a "separate parking area where the employees parked to go to the job site." Tr. at 61:24-25 (Cannedy). See id. at 92:14-20 (Romero). Firebird Structures also offered testimony: (i) that a vehicle of a Firebird Structures' employee, which was parked near the main office while the employee was out of town, had its back windshield "bashed in," Tr. at 27:25-28:3 (Cannedy); (ii) that numerous sheet metal screws were also discovered underneath that vehicle, see Tr. at 69:9 (Erb); and (iii) that screws were discovered behind the tires of Firebird Structures' vehicles at the Presbyterian Hospital job site on Central Avenue, see Tr. at 28:22-23 (Cannedy).

79.     Record testimony reveals, however, that Firebird Structures does not know who placed the screws behind the vehicles' tires. See Tr. at 51:9 (Cannedy). Firebird Structures also did not adduce record evidence establishing which persons, who they allege are affiliated with and authorized by the Carpenters' Union, entered Firebird Structures' property without permission. See Verified Complaint ¶¶ 1-16, 27-31, at 1-4. Whitesitt, the avowed representative of the Carpenters' Union's organizing campaign against Firebird Structures declares that neither the Carpenters Union, nor its agents, vandalized the property of Firebird Structures' owners or employees. See Whitesitt Decl. ¶ 5, at 1. Whitesitt further denies that the Carpenters' Union trespassed on Firebird Structures' property. See Whitesitt Decl. ¶ 13, at 2. Considering the Whitesitt Decl. and the hearing testimony, Firebird Structures' has not adduced sufficient evidence, on this limited record, to establish "clear proof" that the Carpenters' Union authorized, ratified, or had any other involvement in the alleged unauthorized entry of Firebird Structures' property, or in the alleged property damage to the vehicle of a Firebird Structures' employee. As

a result, under the Norris-LaGuardia Act's § 6 and on this record, Firebird Structures does not prevail on the merits of its trespass claim against the Carpenters' Union.

80.     With respect to its nuisance claim, Firebird Structures alleges that the Carpenters' Union obstructed Firebird Structures' use of its property and interfered with its normal business operations and that the Carpenters' Union refused to leave Firebird Structures' property.  See Verified Complaint ¶¶ 33-34, at 4.  In State ex rel. Vill. of Los Ranchos de Albuquerque v. City of Albuquerque, 1994-NMSC-126, 889 P.2d 185, the Supreme Court of New Mexico explained that private nuisance "is variously described as an invasion of the private use and enjoyment of land, or an invasion that affects a single individual or a determinate number of persons in the enjoyment of some private right not common to the public . . . ."  1994-NMSC-126, ¶ 51, 889 P.2d at 198 (internal quotation marks and citations omitted).  In support of its nuisance claim, Firebird Structures offered testimony that, on one occasion, when former Firebird Structures employees went to Firebird Structures' office to retrieve their final paychecks, the Carpenters' Union representatives also presented themselves at the Firebird Structures' office.  See Tr. at 92:24-93:6 (Cannedy).  In response to this allegation, Whitesitt declared that the Carpenters' Union neither picketed Firebird Structures' office nor "blocked access to any of Firebird's jobsites."  Whitesitt Decl. ¶¶ 4, 10-11, at 1-2.  Firebird Structures adduced testimony that, because its office is located on a cul-de-sac, the Carpenters' Union representatives consequently blocked access to the Firebird Structures' facility.  See Tr. at 93:9-12 (Cannedy).  When the police instructed the Carpenters' Union representatives that they were not allowed to block the road, however, the union complied, and the police did not make any arrest.  See Tr. at 102:6-21 (Cannedy).

81.     On the record before the Court, Firebird Structures has not offered evidence of any conduct of the Carpenters' Union that both amounts to a private nuisance and also escapes the Norris-LaGuardia Act's straightforward anti-injunction provisions.  See 29 U.S.C. § 104. The Norris-LaGuardia Act's § 4 prohibits the Court from enjoining the conduct that Firebird Structures attributes to the Carpenters' Union.  The Norris-LaGuardia Act's § 4(f) provides:

> No court of the United States shall have jurisdiction to issue any restraining order or temporary or permanent injunction in any case involving or growing out of any labor dispute to prohibit any person or persons participating or interested in such dispute from . . . [a]ssembling peacefully to act or to organize to act in promotion of their interests in a labor dispute.

29 U.S.C. § 104(f).  To the extent that Firebird Structures' nuisance claim is grounded on allegations that the Carpenters' Union peacefully assembled near to Firebird Structures' office -- but not on Firebird Structures' property -- to act in promotion of their interests in a labor dispute, the Norris-LaGuardia Act Court § 4(f) denies the Court jurisdiction to issue an injunction based on that claim.[14]

82.     Firebird Structures also asserts a harassment claim and a prima facie tort claim against the Carpenters Union.  See Verified Complaint ¶¶ 37-41, at 5.   In its papers, Firebird Structures did not direct the Court to a New Mexico appellate opinion recognizing a specific tort of harassment.  See Verified Complaint ¶¶ 37-41, at 5; Motion at 1-5.  In the Court's review of New Mexico appellate opinions, the Court is unable to locate an opinion recognizing a specific and distinct tort that travels under that heading.  To be sure, the Supreme Court of New Mexico

---

[14]The Court concludes the following hearing colloquy between counsel for the Carpenters' Union and Cannedy, Firebird Structures' president, to be particularly salient: "Q. Okay.  You're trying to get an injunction to stop the union from telling people not to hire you? A. Yeah, pretty much."  Tr. at 58:7-10 (Shanley, Cannedy).

recognizes several intentional torts, including the intentional tort of the intentional infliction of emotional distress.

> In addressing this tort, our courts have adopted the approach used in the Restatement (Second) of Torts § 46 (1965). The following elements must be proven to establish a claim of intentional infliction of emotional distress: (1) the conduct in question was extreme and outrageous; (2) the conduct of the defendant was intentional or in reckless disregard of the plaintiff; (3) the plaintiff's mental distress was extreme and severe; and (4) there is a causal connection between the defendant's conduct and the claimant's mental distress. . . . [E]xtreme and outrageous conduct [is] that which is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

Trujillo v. N. Rio Arriba Elec. Co-op, Inc., 2002-NMSC-004, ¶ 25, 41 P.3d 333, 342-43 (alterations added)(internal quotation marks and citations omitted). The Supreme Court of New Mexico also recognizes prima facie tort. See Schmitz v. Smentowski, 1990-NMSC-002, ¶ 10, 785 P.2d 726, 730. The elements of a prima facie tort are: (i) commission of an intentional lawful act; (ii) the act is conducted with intent to injure the plaintiff; (iii) the act resulted in injury to the plaintiff; and (iv) the act is without social or economic justification or has insufficient justification. See Schmitz v. Smentowski, 1990-NMSC-002, ¶ 10, 785 P.2d at 730. Irrespective of which intentional torts Firebird Structures ascribes to the conduct it alleges, Firebird Structures' fails to demonstrate, by clear proof, that the Carpenters' Union is responsible for any intentionally tortious conduct, however pled.

83.     In support of its "harassment" claim, and ostensibly in support of its prima facie tort claim, Firebird Structures offered testimony showing that, after Firebird Structures' employees quit, Carpenters' Union representatives attended Firebird Structures' job sites and "parked across the street from" Firebird Structures' main office to observe and to communicate with persons seeking employment with Firebird Structures; after speaking with the Carpenters' Union representatives, these persons "would never show back up" at Firebird Structures. Tr. at

24:16-23 (Cannedy).  See Tr. at 88:2-4 (Romero)("They would just sit there taking pictures or video of people walking in and out of our building."); id. at 89:25-90:1 (Romero)("[U]nion reps have gone to the job sites, to multiple job sites, offering cash for our employees to leave . . . ."); id. at 104:11-13 (Romero)(stating that union representatives are "continuing to show up at job sites and asking employees to join the union, offering the money after being told 'No'"); id. at 105:6-16 (Romero)("I've watched them surveil our company and sit there and take pictures of people, and stop them as they walk out of our building . . . to get [employees] to join the union.").

84.     The Norris-LaGuardia Act's § 4, however, prohibits the Court from enjoining the conduct that Firebird Structures attributes to the Carpenters' Union in support of Firebird Structures' harassment claim -- i.e., observing and communicating with Firebird Structures' employees and persons seeking employment at Firebird Structures.  See 29 U.S.C. § 104(e).  The Norris-LaGuardia Act's § 4(e) provides:

> No court of the United States shall have jurisdiction to issue any restraining order or temporary or permanent injunction in any case involving or growing out of any labor dispute to prohibit any person or persons participating or interested in such dispute from . . . [g]iving publicity to the existence of, or the facts involved in, any labor dispute, whether by advertising, speaking, patrolling, or by any other method not involving fraud or violence.

29 U.S.C. § 104(e).  To the extent, therefore, that Firebird Structures attempts to build an intentional tort claim -- whether pled as prima facie tort or harassment -- upon allegations that the Carpenters' Union patrolled and attempted to speak with Firebird Structures' employees and prospective employees to give publicity of a labor dispute between Firebird Structures and the Carpenters' Union, the Norris-LaGuardia Act's § 104(e) prevents the Court from enjoining such conduct.

85.     Also with respect to its harassment and prima facie tort claims, Firebird Structures alleges that the Carpenters' Union "pursued a pattern of conduct intended to annoy, seriously alarm or terrorize" Firebird Structures' owners and employees.  Verified Complaint ¶ 38, at 5.  In support of this claim, Firebird Structures alleges that the Carpenters' Union surveilled and stalked Firebird Structures' owners at their principal place of business, job sites, and homes.  <u>See also</u> Verified Complaint ¶ 12, at 2.  Firebird Structures also introduced testimony showing that: (i) on or about February 15, 2017, at midnight, Cannedy saw a truck parked, which resembled the truck that had parked across from the Firebird Structures' main office, outside of his house; the truck contained four persons who appeared, at least to Cannedy at the midnight hour, to be taking photographs, <u>see</u> Tr. at 25:17-21 (Cannedy); Tr. at 46:14-16 (Cannedy); (ii) Conboy discovered a "a four- or five-pound dead catfish wrapped in bloody newspapers on [his] driveway in front of [his] gate,"  Tr. at 108:15-17 (Conboy); (iii) a vehicle, which had parked across from Firebird Structures, followed Conboy's vehicle after Conboy departed from his office at Firebird Structures, at least once or twice, and at least until Conboy arrived to "a busy intersection," Tr. at 109:1-3 (Conboy); <u>see</u> Tr. at 116:22-117:2 (Conboy); and (iv) one or two vehicles that were parked across from Firebird Structures' main office drove past Conboy's residence, <u>see</u> Tr. at 114:18-115:5 (Conboy).[15]  In response to Firebird Structures' allegations of harassment, Whitesitt declared that neither the Carpenters' Union nor any of its agents "have ever followed or stalked Firebird's owners at their office, jobsite and home."  Whitesitt Decl. ¶ 8, at 2.  Whitesitt further declares that the Carpenters' Union has neither "threatened any violence

---

[15]Firebird Structures also proffered testimony and evidence that the Carpenters' Union placed a sign on a street near to Conboy's residence, stating that "Firebird Bad For America & Bad for New Mexico.  New Mexico Beware!"  Firebird Structures' TRO Hearing Ex. 6.  <u>See</u> Tr. at 110 2-12 (Conboy, Thomas).  The Norris-LaGuardia Act's § 104(e), however, prevents the Court from enjoining that protected activity.  <u>See</u> 29 U.S.C. § 104(e).

against Firebird or any of its management or employees," nor "intimidated or harassed any of Firebird's owners or employees."  Whitesitt Decl. ¶ 12, at 2.

86.     On this record, the testimony that Firebird Structures adduced regarding midnight photographs, a dead catfish, and of a vehicle driving past the residences of Firebird Structures' principals, while concerning, does not amount to "clear proof" that the Carpenters' Union authorized, ratified, or otherwise participated in the alleged conduct.  The clear proof standard is more exacting than a preponderance of the evidence.  See Fry, 88 F.3d at 842 (citing Gibbs, 383 U.S. at 737 & 739; Anderson v. Liberty Lobby, Inc., 477 U.S. at 254).  The standard requires proof which is "clear, unequivocal, and convincing."  Fry, 88 F.3d at 841 (citing Ramsey, 401 U.S. at 311; Gibbs, 383 U.S. at 737).  The testimony that Firebird Structures offered does not amount to clear proof of the Norris-LaGuardia Act's § 6's "requirements of *actual* participation in, or *actual* authorization of unlawful acts, or of ratification of such acts after *actual* knowledge thereof . . . ."  Fry, 88 F.3d at 841-42 (emphasis original)(citing 29 U.S.C. § 106; Carbon Fuel Co. v. United Mine Workers, 444 U.S. at 217 n.6).  The testimony does not unequivocally establish that the Carpenters' Union participated in or authorized the harassing activities that form the basis of Firebird Structures' intentional tort claims.

87.     On this limited record, therefore, the Court cannot soundly conclude that Firebird Structures is likely to succeed on the merits of any intentional tort claim predicated on its allegations that the Carpenters Union harassed Firebird Structures' principals and employees.

88.     On this limited record, the Norris-LaGuardia Act's application creates a dilemma for Firebird Structures.  On the one hand, the activity that Firebird Structures can ascribe to the Carpenters' Union by clear proof -- i.e., peacefully assembling, giving publicity to the labor dispute, patrolling and communicating with Firebird Structures' employees -- is protected from

injunctive relief by the Norris-LaGuardia Act's § 4, 29 U.S.C. § 104. On the other hand, Firebird Structures cannot by clear proof demonstrate that the Carpenters' Union authorized or was otherwise involved in certain alleged activity that the Norris-LaGuardia Act does not protect -- i.e., the breaking of a windshield, the placement of screws underneath company vehicles, and the unauthorized entry onto Firebird Structures' property.

## VI.    ON THIS RECORD, THE FOUR FACTORS GUIDING THE PROPRIETY OF PRELIMINARY INJUNCTIVE RELIEF WEIGH AGAINST THE ISSUANCE OF A TRO IN FIREBIRD STRUCTURES' FAVOR.

89.    On the limited record before the Court, the four factors guiding the propriety of PI relief weighs against the Court's issuance of a TRO to Firebird Structures. The applicant for PI relief must "establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Winter, 555 U.S. at 20 (citing Munaf v. Geren, 553 U.S. 689-690); Amoco Production Co. v. Gambell, 480 U.S. at 542 (1987); Weinberger v. Romero-Barcelo, 456 U.S. at 311-312 (1982)). The Court considers and weighs these four factors in determining whether to grant a TRO. See Herrera v. Santa Fe Pub. Sch., 792 F. Supp. 2d at 1181 (citing Resolution Trust Corp. v. Cruce, 972 F.2d at 1198).

90.    On this record, Firebird Structures has not demonstrated that it is likely to succeed on the merits of its state-law claims.[16] First, the LMRA's § 303, 29 U.S.C. § 7, preempts Firebird Structures' two tortious interference with contractual relations claims, because

---

[16]For the reasons discussed supra, Firebird Structures is not entitled to injunctive relief on its only federal claim for violation of the LMRA's § 303, 29 U.S.C. § 187. See San Antonio Cmty. Hosp. v. S. California Dist. Council of Carpenters, 125 F.3d at 1235 ("[A]n employer cannot seek injunctive relief from a secondary boycott under section 303; only damages are available."); California Ass'n of Employers v. Building and Constr. Trades Council of Reno, 178 F.2d at 178 ("The [LMRA] did not give private litigants the right to obtain injunctive relief even in those situations where a suit for damages was allowed.").

allegations of violence or imminent threats do not support those claims. See Gibbs, 383 U.S. at 721; Morton, 377 U.S. at 257-260; Garmon, 359 U.S. at 247-48; San Antonio Cmty. Hosp. v. S. California Dist. Council of Carpenters, 125 F.3d at 1235; BE & K Constr. Co. v. United Bhd. of Carpenters & Joiners of Am., 90 F.3d at 1327-30; Iodice v. Calabrese, 512 F.2d at 390; Hennepin Broad. Assocs., Inc. v. NLRB, 408 F. Supp. at 938. See also The Developing Labor Law § 28.V.A, at 2544-45. Next, the Norris-LaGuardia Act, 29 U.S.C. § 101-115, applies to Firebird Structures' claims for trespass, nuisance, harassment, and prima facie tort, because Firebird Structures' suit against the Carpenters' Union involves or grows out of a labor dispute. See 29 U.S.C. §§ 101, 113(a)-(c). Consequently, the Norris-LaGuardia Act's § 6, 29 U.S.C. § 106, requires Firebird Structures to demonstrate by "clear proof" that the Carpenters' Union participated in or authorized the tortious conduct which Firebird Structures alleges. 29 U.S.C. § 106. See Fry, 88 F.3d at 841-42. On this limited record, Firebird Structures has not demonstrated by "clear proof" that the Carpenters' Union authorized, or was otherwise involved, in the trespassory and harassing conduct that Firebird Structures alleges in support of its claims of trespass, nuisance, harassment, and prima facie tort. Fry, 88 F.3d at 841-42.

> [U]nion liability under [the Norris-LaGuardia Act's § 6] for tortious acts cannot be established by an inference drawn solely from the fact that union members are committing unlawful acts, even in groups and even over a substantial period of time ("mass action" theory). Nor can liability be established by an inference drawn solely from the fact that the union fails to take affirmative measures to stop such acts ("best efforts" theory).

Fry, 88 F.3d at 842 (alterations added). Firebird Structures has not shouldered that heavy burden, and, accordingly, Firebird Structures has not demonstrated that it is likely to succeed on the merits of its state-law claims against the Carpenters' Union.

91. Nor has Firebird Structures demonstrated that it is likely to suffer irreparable harm in the absence of a TRO. See Winter, 555 U.S. at 22 ("Our frequently reiterated standard

requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is <u>likely</u> in the absence of an injunction.")(emphasis original). "In defining the contours of irreparable harm, case law indicates that the injury must be both certain and great, and that it must not be merely serious or substantial." <u>Dominion Video Satellite, Inc. v. Echostar Satellite Corp.</u>, 356 F.3d 1256, 1262 (10th Cir. 2004)(internal quotation marks and citation omitted). "A plaintiff satisfies the irreparable harm requirement by demonstrating 'a significant risk that he or she will experience harm that cannot be compensated after the fact by monetary damages.'" <u>RoDa Drilling Co. v. Siegal</u>, 552 F.3d 1203, 1210 (10th Cir. 2009)(<u>Greater Yellowstone Coal. v. Flowers</u>, 321 F.3d 1250, 1258 (10th Cir. 2003)).

92.     Firebird Structures has not established that, absent a TRO, it is likely to suffer "harm that cannot be compensated after the fact by monetary damages." <u>RoDa Drilling Co. v. Siegal</u>, 552 F.3d at 1210 (internal quotation marks and citation omitted). In its Motion, Firebird Structures asserts that it "will suffer immediate and irreparable economic injury if a Temporary Restraining Order does not issue." Motion at 5. At the hearing, however, Firebird Structures did not adduce sufficient evidence to establish this contention. In support of its allegation of irreparable harm, Firebird Structures adduced testimony that, as a result of the Carpenters' Union's activity, Firebird Structures has "lost business," is "going to lose business," Tr. at 36:14-15 (Cannedy), and, therefore, is concerned about its "viability," Tr. at 36:18 (Cannedy). Firebird Structures did not introduce, however, testimony regarding what contracts it has lost, or which clients it will imminently lose. <u>See</u> Tr. at 36:9-19 (Cannedy). Firebird Structures also offered testimony that the Carpenters' Union's actions has impacted its business, because "[i]t's hard to find workers now . . . . [I]t's getting really hard out there to find good carpenters." Tr. at 38:3-6 (Cannedy). Firebird Structures additionally introduced testimony that: (i) it had to relocate

workers to projects in west Texas as a result of the Carpenters' Unions' efforts to communicate

with those workers, see Tr. at 37:24-25 (Cannedy); and (ii) the Carpenters' Unions' actions have

"delayed [Firebird Structures] some, [because it] ha[s] had to move to move employees around,

Tr. at 37:2-4 (Cannedy). The harms that Firebird Structures allege predominantly concern its

revenue, and the Court therefore cannot soundly conclude that the harms that Firebird Structures

allege are of the species which "cannot be compensated after the fact by monetary damages."

RoDa Drilling Co. v. Siegal, 552 F.3d at 1210 (internal quotation marks and citation omitted).

93.     Last, the Court considers the equities and whether "an injunction is in the public

interest." Winter, 555 U.S. at 20 (citing Munaf v. Geren, 553 U.S. 689-690). In light of the

Norris-LaGuardia Act and NLRA, the Court cannot soundly conclude that issuing an injunction

in a case involving a labor dispute finds support in the equities or is in the public interest.

Congress enacted the Norris-LaGuardia Act, 29 U.S.C. §§ 101-115, to restrict federal judicial

intervention in labor disputes "to promote employer recognition of unions and thus foster the

practice of collective bargaining as an institution in the conduct of labor relations." The

Developing Labor Law § 1.III.D, at 22. See 29 U.S.C. § 102; Bhd. of R.R. Trainmen, 321 U.S.

at 58. ("The overall policy of the Norris-LaGuardia Act was . . . to encourage use of the

nonjudicial processes of negotiation, mediation and arbitration for the adjustment of labor

disputes."). As the Supreme Court explained, the Norris-LaGuardia Act "sought to make

injunction a last line of defense, available not only after other legally required methods, but after

all reasonable methods as well, have been tried and found wanting. This purpose runs through

the Act's provisions." Bhd. of R.R. Trainmen, 321 U.S. at 58. In light of both Congress' and

the Supreme Court's statement of the Norris-LaGuardia Act's purpose, the Court cannot soundly

conclude that, at this time and on this limited record, the equities or the public interest favors the

issuance of an injunction against the Carpenters' Union. Firebird Structures and the Carpenters' Union are clearly involved in a labor dispute. See 29 U.S.C. § 113(a)-(c); NLRB Charge Against Employer at 2. Congress greatly limited the Court's jurisdiction to intercede in the labor dispute between Firebird Structures and the Carpenters' Union by issuing injunctive relief, thereby encouraging Firebird Structures and the Carpenters' Union to attempt other methods beyond the federal courts' province to resolve their dispute.

94. Moreover, the Court emphasizes that the Norris-LaGuardia Act deprives the Court of jurisdiction to enjoin the Carpenters' Union from certain activities that Firebird Structures alleges are tortious. See 29 U.S.C. § 104. For example, the Court is without jurisdiction to enjoin the Carpenters' Union from (i) peacefully assembling near to Firebird Structures' office -- but not on Firebird Structures' property -- to act in promotion of their interests in a labor dispute, see 29 U.S.C. § 104(f); (ii) attempting to speak with Firebird Structures' employees and prospective employees to give publicity of a labor dispute between Firebird Structures and the Carpenters' Union, so long as those methods do not involve "fraud or violence," 29 U.S.C. § 104(e); and (iii) from otherwise "giving publicity to the existence of, or the facts involved in, any labor dispute, whether by advertising, speaking, patrolling, or by any other method not involving fraud or violence," 29 U.S.C. § 104(e).

**IT IS ORDERED** that Firebird Structure's Application for Temporary Restraining Order and Preliminary Injunction, filed April 4, 2017 (Doc. 3), is denied.[17]

---

[17]Rule 65 of the Federal Rules of Civil Procedure states: "The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). Moreover, § 7 of the Norris-La Guardia Act § 7, 29 U.S.C. § 107, in part provides:

_____

UNITED STATES DISTRICT JUDGE

_Counsel_:

Benjamin E. Thomas
Keith C. Mier
Sutin Thayer & Browne, A Professional Corporation
Albuquerque, New Mexico

       _Attorneys for the Plaintiff_

Shane C. Youtz
James A. Montalbano
Stephen Curtice
Youtz & Valdez PC
Albuquerque, New Mexico

-- and --

Daniel M. Shanley
Yuliya Mirzoyan
DeCarlos & Shanley, A Professional Corporation
Los Angeles, California

       _Attorneys for the Defendant_

---

No temporary restraining order or temporary injunction shall be issued except on condition that complainant shall first file an undertaking with adequate security in an amount to be fixed by the court sufficient to recompense those enjoined for any loss, expense, or damage caused by the improvident or erroneous issuance of such order or injunction, including all reasonable costs (together with a reasonable attorney's fee) and expense of defense against the order or against the granting of any injunctive relief sought in the same proceeding and subsequently denied by the court.

29 U.S.C. § 107. The Carpenters' Union did not request a security. If, however, the Court had granted a TRO, the Court would have ordered Firebird Structures to post a security of $500.00 at this time and on this record, and allowed the Carpenters' Union to request that the Plaintiffs post a different security at a later time.